UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

BAZAK SHARON, MD

Plaintiff

vs.

Nancy Sanders Harper, MD, individually and in her various executive roles with the University of Minnesota Medical School, University of Minnesota Physicians and M Health Fairview Masonic Children's Hospital; Sameer Gupta, MD, individually and in his various executive roles with the University of Minnesota Medical School, University of Minnesota Physicians and M Health Fairview Masonic Children's Hospital; Joseph Neglia, MD individually and in his role as Head of Pediatrics at the University of Minnesota Medical School; Jordan Marmet, MD, individually and in his role as Director of the Division of Pediatric Hospital Medicine, University of Minnesota Medical School; Caroline George, MD; The University of Minnesota Physicians d/b/a U of M Physicians; Fairview Health Services, d/b/a M Health Fairview Masonic Children's Hospital; and The Board of Regents of the University of Minnesota;

Defendants.

Case No.

**COMPLAINT**

**JURY TRIAL
DEMANDED UNDER
FED. R. CIV. P. 38(b)**

FOR HIS COMPLAINT AND JURY DEMAND, BAZAK SHARON, MD, by and through counsel, the Law Offices of J.M. Reinan, PC, states and alleges against **Nancy Sanders Harper**, MD, individually and in her various executive roles with the University of Minnesota Medical School, University of Minnesota Physicians and M Health Fairview Masonic Children's Hospital; **Sameer Gupta, MD**, individually and in his various executive roles with the University of Minnesota Medical School, University of Minnesota Physicians and M Health Fairview Masonic Children's Hospital; **Joseph Neglia, MD** individually and in his role as Head of Pediatrics at the University of Minnesota Medical School; **Jordan Marmet, MD**, individually and in his role as Director of the Division of Pediatric Hospital Medicine, University of Minnesota Medical School; **Caroline George, MD**; **The University of Minnesota Physicians** d/b/a U of M Physicians; **Fairview Health Services**, d/b/a M Health Fairview Masonic Children's Hospital; and **The Board of Regents of the University of Minnesota** as follows:

## I.    INTRODUCTION

1.    In June 2023, after serving for seventeen years as a pediatrician and Assistant Professor of Medicine at the University of Minnesota Medical School, Defendants fired Plaintiff Bazak Sharon, MD ("Sharon") from his hospital and teaching positions.

2.    Sharon was terminated because he discovered and reported a fraudulent, unethical, and unconstitutional scheme orchestrated by the Defendants by and through Defendant Nancy Sanders Harper, "Harper" to maximize the identification and prosecution of child abuse in exchange for significant public and private funding and the perpetuation of the University's prestigious child abuse fellowship program.

3.    Defendants' unlawful and fraudulent scheme consisted of institutional policies and practices that:

- Force the transfer of certain sick and injured babies from the care of a team of trained clinicians to a forensic child abuse pediatrician, "CAP," thereby assigning care of the sick baby to a person not specially trained to diagnose or treat the illness or injury that brought the baby to the hospital in the first place;

- prohibit University clinicians from documenting or expressing medical

2

opinions that conflict with child abuse determinations made by CAPs;

- Encourage the manipulation, omission and falsification of medical evidence that may exculpate parents and caregivers accused child abuse by CAPs; and

- Permit Harper and senior leadership to bully and threaten clinicians who openly disagree with the CAP's child abuse determination.

4. Defendants implemented these policies in order to further the goal of maximizing child abuse prosecutions even though Defendants knew that their scheme was medically, ethically and legally injurious to the babies, parents and families Defendants were supposed to serve.

5. When Sharon accidentally learned of Defendants' scheme, he immediately reported it to the institutional Defendants' senior leadership team, fully and reasonably expecting that this team of clinicians, administrators and University professors would put an immediate stop to a scheme that resulted in the medical and legal abuse of University patients and families.

6. What Sharon didn't appreciate is that the amount of money and prestige brought to the University by Harper and her team was so important to Defendants and their institutions that they were financially and politically forced to silence Sharon rather than stop their institutional abuse of the patients and families that came to them for medical help.

7. Thus, after Sharon made his initial complaint about their wrongful policies, Defendants' highest-ranking officials warned Sharon to stop complaining about those wrongful policies.

8. After Sharon refused to stop complaining about the wrongful policies, the institutional Defendants' highest-ranking officials retaliated by ordering Sharon to attend disciplinary meetings – one of which Sharon surreptitiously captured on his iPhone.

3

9.     When the threats of discipline didn't work, some of the Defendants fabricated what amounts to "dirt" against Sharon, warning that if he didn't stop complaining about the false child abuse prosecutions and the University policies that spawned them, he would be fired.

10.    Sharon refused to back down.  He was fired as a result.

11.    After Sharon later blew the whistle on Defendants' scheme, some of the Defendants retaliated against him by manufacturing false and outrageous allegations that Sharon had been fired for sexual misconduct and spread those lies to others in order to silence Sharon and prevent him from testifying in federal lawsuits filed against some of these Defendants.

12.    Sharon brings this suit not only to seek compensation for Defendants' wrongful conduct but also to enjoin Defendants from continuing to engage in unconstitutional conduct and a pattern of racketeering.

## II.     JURISDICTION

13.     This action arises under the Constitution and laws of the United States, including Article III, Section 1 of the United States Constitution; The First and Fourteenth Amendments to the United States Constitution; 42 U.S.C. §§ 1981; 1983; 1988; 18 U.S.C. § 1030; and 18 U.S.C. § 1961 *et seq.*  The jurisdiction of this Court is further invoked pursuant to 28 U.S.C. §§ 1331, 1343, 2201 and 2202.

14.    This case is brought in the United States District Court for the District of Minnesota pursuant to 28 U.S.C. § 1391 as the judicial district in which all relevant events and omissions occurred and in which Defendants maintain offices and/or reside.

15.    Supplemental pendent jurisdiction is based on 28 U.S.C. § 1367 because the violations of federal law alleged are substantial and the pendent causes of action derive from a common nucleus of operative facts.

### III.   PARTIES AND VENUE

16.   Plaintiff Bazak Sharon, MD, "Sharon" or "Plaintiff" is a well-respected and well-qualified pediatrician specializing in pediatric infectious disease, hospital medicine and clinical immunology.

17.   Sharon is a former employee of Defendants University of Minnesota Physicians, "UMP," and the University of Minnesota, "U of M" or "University," where he held the positions of Medical Director of the University's Pediatric COVID program and Assistant Professor of Medicine within the University of Minnesota Medical School, Department of Pediatrics.

18.   At times relevant, Sharon had privileges to practice medicine at M Health Masonic Fairview Children's Hospital, which is owned and operated by Defendant Fairview Health Services, herein collectively "Fairview."

19.   Sharon is a resident of Minnesota and a citizen of the United States.

20.   Defendant Nancy Sanders Harper, MD is a pediatrician with a subspecialty in child abuse pediatrics.

21.   Harper is sued individually and in her various executive roles with the University and Fairview.

22.   Harper is the Child Abuse Pediatrics Fellowship Program Director and a Professor of Pediatric Emergency Medicine within the Department of Pediatrics at the University of Minnesota, which is owned and operated by the University.

23.   Harper is also the Medical Director of the Otto Bremer Trust Center for Safe & Healthy Children ("The Center"), a sub department of the U of M Department of Pediatrics.

24.   The Center was created by, is managed by and is funded by Otto Bremer Trust, "Bremer."

25. The Center is operated, medically staffed and supervised by UMP and is located at Fairview.

26. Fairview credentials physicians at its hospital, including Plaintiff and the defendant physicians.

27. Harper is co-employed by UMP.

28. At times relevant, Harper set and supervised UMP, U of M and Fairview's medical policies, procedures, customs and practices in regard to child abuse diagnosis and treatment.

29. Harper is an agent of and/or co-employee of Hennepin County, where she acts as an agent, contractor and/or consultant for the Hennepin County and assists in the identification and prosecution of persons accused of child abuse.

30. In these roles, Harper:

    a. Generates and supervises the creation of medical evidence used in child abuse prosecutions in criminal court, child protective services actions in civil court, and maltreatment actions in administrative court in Hennepin County;

    b. Edits and manipulates medical evidence generated by physicians assigned to diagnose and treat suspected victims of child abuse;

    c. Supervises and directs Hennepin County child abuse employees;

    d. Edits and manipulates evidence generated by Hennepin County child abuse employees;

    e. Supervises and directs law enforcement officials and investigators; and

f.      Supervises and directs investigative employees of the Hennepin County Attorney's Office, "HCAO."

31.    Harper has privileges to practice medicine at HH and Fairview.

32.    Harper is a resident of Minnesota and citizen of the United States of America acting within the scope and course of her employment and under color of state law.

33.    Defendant Board of Regents of the University of Minnesota is the University's governing body and "body corporate . . . with the right as such, of suing and being sued." Minn. Laws 1851, cl. 3, § 7; *see also Miller v. Chou*, 257 N.W.2d 277, 278 (Minn. 1977). The Board of Regents consists of twelve members elected pursuant to Minn. Stat. § 137.0246.

34.    The University is sued pursuant to *Ex parte Young*, 209 U.S. 123 (1908), for acting under color of state law.

35.    The University is a proper entity to be sued under 42 U.S.C. § 1983 for its deliberately indifferent policies, practices, habits, customs, procedures, and training with respect to its Child Abuse Pediatrics Fellowship Program, the diagnosis of child abuse in pediatric populations presenting Fairview, which resides on the U of M campus, and other entities supervised and overseen by physicians employed by the U of M, UMP, as well as its forensic services and participation/oversight of persons accused of child abuse.

36.    The U of M is also sued for its deceptive advertising and marketing practices.

37.    The U of M and Fairview advertise and promise that:

a.      The Otto Bremer Trust Center for Safe and Healthy Children at M Health Fairview Masonic Children's Hospital is dedicated to providing medical care for victims and potential victims of child abuse and neglect.

b.      The M Health Fairview Masonic Children's Hospital is Minnesota's only

        university-affiliated pediatric hospital engaged in leading research with the potential to radically improve the way we care for critically ill children.

    c.     Our strength stems from the relationship with the children's hospital and the department's pediatric research experts who continually develop new therapies, sharing their best available treatments with patients.

    d.     Care is provided through "teamwork and collaboration" between medical professionals.

38.    UMP employs, trains and supervises some or all of the members of the medical staff at several major acute care hospitals in Hennepin County, including Hennepin Healthcare, "HH" and Fairview.

39.    UMP also directs and supervises clinical care at HH and Fairview and is part of Hennepin County's child abuse program.

40.    UMP provides HH and Fairview with policies, procedures, protocols and customs followed by physicians and staff at both HH and Fairview.

41.    UMP and U of M contract with Hennepin County to provide child abuse services at HH and Fairview.

42.    Upon entering into formal and informal agreements to provide diagnostic services, oversight and forensic services to Hennepin County, Fairview, U of M and UMP assumed public, local and county functions, acted under color of state law, and are legally responsible to comply with all requirements of the United States Constitution.

43.    Defendant Sameer Gupta, MD, "Gupta," is sued individually and in his various leadership or executive roles at the University, UMP and Fairview.

44.    At times relevant, Gupta was an Associate Professor, Division of Pediatric

Critical Care Medicine, U of M Department of Pediatrics; Chief Medical Officer & Executive Inpatient Medical Director, Fairview;  and Vice President of Medical Affairs, Fairview.

45. At times relevant, Gupta set and supervised UMP, U of M and Fairview's medical policies, procedures, customs and practices.

46. At times relevant, Gupta had the power to hire and fire UMP physicians, discipline UMP physicians and restrict Fairview physician privileges.

47. As a result of these powers, Gupta effectively had the power to terminate University Medical School assistant professors like Sharon, who depended on UMP and Fairview privileges in order to carry out their teaching roles.

48. Gupta is a resident of Minnesota and citizen of the United States of America.

49. Defendant Joseph Neglia, MD, "Neglia," is sued individually and in his various leadership or executive roles at the University, UMP and Fairview.

50. At times relevant, Neglia was the Department Head and Professor of the U of M Division of Pediatric Hematology and Oncology and Physician in Chief of Fairview.

51. At times relevant, Neglia set and supervised UMP, U of M and Fairview's medical policies, procedures, customs and practices within Sharon's medical department.

52. At times relevant, Neglia had the power to hire and fire UMP physicians, discipline UMP physicians and restrict Fairview physician privileges.

53. As a result of these powers, Neglia effectively had the power to terminate University Medical School associate professors like Sharon, who depended on UMP and Fairview privileges in order to carry out their teaching roles.

54. Neglia is a resident of Minnesota and citizen of the United States of America.

55. Defendant Jordan Marmet, MD, "Marmet," is sued individually and in his various

9

leadership or executive roles at the University, UMP and Fairview.

56.    At times relevant, Marmet was an Associate Professor, Division of Pediatric Hospital Medicine, U of M Department of Pediatrics; Associate Vice Chair of Education at U of M Department of Pediatrics; and the Head of Fairview's Pediatric Hospitalist Department.

57.    At times relevant, Marmet set and supervised UMP, U of M and Fairview's medical policies, procedures, customs and practices for pediatric hospitalists at Fairview, including Sharon.

58.    At times relevant, Marmet had the power to discipline pediatric hospitalists at Fairview and UMP, including Sharon.

59.    Marmet is a resident of Minnesota and citizen of the United States of America

60.    At times relevant, Defendant Carolyn George, MD, "George," was a child abuse pediatrician, "CAP" on staff of the University of Minnesota Medical School; an employee of UMP; and a member of Harper's child abuse team.

61.     George is a resident of Minnesota and citizen of the United States of America at times acting within the scope and course of her employment and under color of state law.

62.    UMP is vicariously liable for the acts and omissions of its agents and employees, including Harper, Gupta, Neglia, Marmet and George.

63.    Fairview is vicariously liable for the acts and omissions of its department heads, including Harper, Gupta, Neglia and Marmet.

## IV.    FACTUAL BACKGROUND

### Development of "Shaken Baby Syndrome" and the resulting development of the subspecialty of Child Abuse Pediatrics

64.    Shaken Baby Syndrome ("SBS/AHT") is an unproven, unscientific medical hypothesis that ultimately spurred the development of an entire child abuse enterprise as well as

the medical subspecialty of child abuse pediatrics.

65.     The underlying hypothesis of SBS/AHT was first suggested by British neurosurgeon Norman Guthkelch in 1971. Dr. Guthkelch studied thirteen cases of infants with subdural hematomas and found that five of those cases demonstrated no external injuries. Dr. Guthkelch theorized that the intracranial findings in those infants could have been caused by shaking. He cited to an observation study of Dr. Ayub K. Ommaya in which monkeys were subjected to sudden accelerative/decelerative forces.  Dr. Ommaya's paper on monkeys was the only source of experimental data upon which the original hypothesis was based.

66.     In 1984, Ludwig and Warman published a paper titled, *Shaken Baby Syndrome: A Review of 20 Cases.* In this review, the authors examined twenty cases of children who were reported as victims of child abuse. Of 1,250 children referred to Child Protective Services, "CPS," 20 met the criteria for SBS/AHT. 14 were boys and 6 were girls, ranging in age from one to 15 months.

67.     Of the 20 cases reviewed by Ludwig and Warman, 16 children had their head circumferences measured. Nine children were identified with head circumference, "HC" measurements greater than the 90th percentile, and eleven children had a full or bulging anterior fontanelle (soft spot on an infant's head that closes between 4 and 26 months of age.)

68.     15 children were subject to funduscopic examinations. 12 were positive for retinal hemorrhages (3/15 unilateral, 12/15 bilateral.) All 20 children were subject to computed cranial tomography ("CT") scans. Ten children were identified with subdural hemorrhages, eight with cerebral contusions, and five with subarachnoid hemorrhages.

69.     Of the 20 cases reviewed, 3 children died, and 10 children had significant morbidity including blindness, visual impairment, motor impairment, seizures, and developmental

delay.

70.     Ludwig and Warman concluded from the analysis of this data that HC measurements in the 90+ percentiles were an early indicator of SBS/AHT caused by behavioral corrective efforts by parents and caregivers over time that produced cumulative morbidity and potentially death.

71.     In other words, these researchers concluded that shaking a baby's head, over time, would result in excessive head growth, "macrocephaly," and ultimately sickness or death.

72.     In 1993, the American Academy of Pediatrics ("AAP") published its first official statement on the SBS/AHT "triad" of injuries.

73.     The AAP instructed physicians to assume SBS/AHT had occurred notwithstanding the absence of external injuries or caregiver reports of accidental events and/or natural disease process.

74.     The AAP also recommended that teams of specialists be formed for the specific task of working with children suspected to be victims of SBS/AHT. These teams were to be led by a new forensic subspecialty known as the child abuse pediatrician, "CAP." The CAP would lead a team of forensic physicians comprised of pediatric radiologists, neurologists, neurosurgeons and ophthalmologists. In that moment, the modern child abuse enterprise was born.

75.     In its 1993 statement, the AAP instructed that SBS/AHT symptoms may not be immediately identifiable. Supporting Ludwig and Warman's view that SBS/AHT was often the result of repeated shaking over time – and demonstrated by head circumferences above the 90th percentile -- the AAP characterized SBS/AHT as equally likely to present with gradual or subtle symptoms such as poor feeding, vomiting, lethargy and irritability over days and weeks.

76.     Around this same time, a three-year nationwide campaign was launched to raise public awareness about "Shaken Baby Syndrome."

77.     After the AAP statement and media blitz, criminal allegations and prosecutions of SBS/AHT soared.

78.     Prior to 1990, only fifteen cases of alleged SBS/AHT reached the appellate courts. Between 1990 and 2000, over two hundred SBS/AHT cases reached the appellate courts, and between 2000 and 2010, there were over eight hundred such SBS/AHT cases.

79.     Although Dr. Guthkelch originally theorized the shaking mechanism within the context of medical care, SBS/AHT had been commandeered by state and local prosecutors for the purpose of criminal prosecution.

80.     In 2001, the AAP published a paper that gave rise to the most current SBS/AHT theory that governs the testimony of CAPs nationwide. Contrary to its position in 1993, the AAP then proclaimed that the clinical signs of SBS/AHT "…are immediate and identifiable as problematic even to parents who are not medically knowledgeable."

81.     This new position also effectively scrapped the previous medical studies demonstrating that SBS/AHT usually involved a prolonged process of shaking that manifested itself through abnormal enlargement of the baby's head.

82.     In 2009, the AAP released yet another policy statement, this acknowledging the problems inherent to the term "shaken baby syndrome." In this statement, AAP recommended the use of the term "abusive head trauma" as an alternative. At that moment, SBS/AHT was born.

83.     In the Consensus Statement on Abusive Head Trauma in Infants and Young Children (2018), the term AHT is used as a synonym for all forms of child abuse, for SBS/AHT and as an umbrella term containing all mechanisms of physical abuse to the head including

13

SBS/AHT.

84.     Despite the fact that the SBS/AHT hypothesis was never proven to be a reliable medical diagnosis through peer reviewed testing and biomechanical analysis, it was rapidly adopted as a standard for prosecuting infant brain injuries in the absence of obvious external traumatic findings for a number of reasons – many of which have little or nothing to do with child abuse or the prosecution of actual child abusers.

85.     Rather, the SBS/AHT hypothesis became popular because it became an easy route for securing child abuse convictions. Development and use of the SBS/AHT hypothesis also became politically important, given the overwhelming public distaste over child abuse injuries and deaths, especially after the early 1990s media campaign.

86.     SBS/AHT is popular with prosecutors because it provides them with a rare "magic bullet."

87.     Testimony from a single pediatric abuse expert can prove all elements of the crime of child abuse resulting in death or serious injury, including the manner of death, the identity of the assailant or killer, and the perpetrator's intent. Thus, if a baby or young child presents to the hospital with the triad of injuries – and nothing else – all that remains for the prosecution to do is identify the last person with the baby prior to the onset of the severe symptoms of traumatic brain injury, and that person will often go to prison.

88.     The SBS/AHT hypothesis is also attractive to prosecutors because it effectively lowers the state's burden of proof.

89.     An abuse investigation is comprised of three parallel investigations: a maltreatment investigation, a child abuse investigation, and a criminal investigation. The consequences of a maltreatment investigation is often a maltreatment finding.

14

90.     Once a person is found to have maltreated a child they are placed on a central registry disqualifying them from most licensed jobs and volunteering, adopting or fostering children, and some housing. Maltreatment findings are conducted outside the court process at a preponderance standard.

91.     Child abuse cases are often tried initially in juvenile court, where a clear and convincing standard applies. Thus, when a person is accused of causing injury to a child, prosecutors can strategically opt to bring a juvenile court proceeding first.

92.     The juvenile court typically does not assign experts, and as a result, the prosecutor is able to essentially develop the state's case without much pushback from the underfunded juvenile court defendant. Often, defendants and their family resources are exhausted on juvenile matters, leaving no money for criminal defense and, more importantly, defense medical experts when charges are finally levied.

93.     Child abuse prosecutions are also wildly successful because of the development of what amounts to a child abuse enterprise.

94.     Over the years, lobbying and publicity efforts by child abuse prosecution proponents – including child abuse pediatricians, prosecutors and child welfare caseworkers – has resulted in significant government and private funding and what amounts to a financial, political and medical machine built on identifying and prosecuting child abuse.

95.     Medical schools at colleges and universities across the county have created departments that teach and validate SBS/AHT and other child abuse diagnoses and hypotheses. State legislation has prescribed the mandatory formation of multidisciplinary teams ("MDT") tasked with finding and prosecuting child abuse.  Massive marketing campaigns have taught the public about the scourge of SBS/AHT and other forms of child abuse.

96.     Thus, even if a person accused of child abuse has money, she faces a well-organized public-private partnership of highly credentialed child abuse pediatricians who are actually by design partnered with the prosecution and backed by massive public funding and a longstanding public relations campaign – and who use this power to convince juries that the abuse most certainly occurred, even if the medical evidence is flimsy or sometimes nonexistent.

97.     Moreover, the child abuse enterprise has made child abuse pediatricians so intertwined within the prosecution process that they are often the ones causing the prosecutions – as is the case in Hennepin County.

98.     The child abuse enterprise depends on this relationship for its funding. Because child abuse pediatrics is a forensic practice – devoted to the development and support of medico-legal evidence – most of its services cannot be billed to insurance. Thus, the enterprise receives its funding through generating medical evidence used in child abuse prosecutions.  Child abuse pediatricians are thus incentivized to find child abuse and in fact the entire enterprise depends on its pediatricians finding and causing the prosecution of child abusers.

99.     While child abuse prosecution teams' close relationship to law enforcement, prosecutors and local governments provide them with what amounts to unlimited resources, the overwhelming majority of defendants do not have the money or resources necessary to rebut the power, politics, money and reputation of the child abuse enterprise.

100.    The parents and caregivers subjected to child abuse prosecutions are disproportionately blue collar, low income or minority persons who lack the resources to combat prosecutions spearheaded by well-credentialed university pediatric experts.

101.    Upon information and belief, as high as 80% of child abuse allegations are made against parents and caregivers at or below 100% of the poverty line while 98% are made against

16

parents and caregivers at or below 399% of the poverty line, as established in the US Census Bureau report *Health Insurance Coverage in the United States: 2022.*

102. In fact, Defendant Harper and others recently published a multicenter study titled, *Variation in Use of Neuroimaging in the Care of Infants Undergoing Subspecialty Evaluations for Abuse: A Multicenter Study,* October 28, 2024. The study self-reports that of the 1,114 infants in the study population, 72% were publicly insured (Medicaid funded Medical Assistance or partially Medicaid/State funded public health insurance) or uninsured. Upon information and belief, of the 26% studied who had private or military insurance, most of this population was also at or below 399% of the poverty line.

103. Thus, while child abuse physicians and their related child advocacy centers regularly testify and publicly profess that child abuse spans across all social and economic levels, races, religions, and cultures, the statistics suggest a predatory interest in blue collar, low-income and minority families.

104. Because child abuse diagnoses are partially validated by legal determinations, child abuse physicians seek out low-income caregivers that lack the financial wherewithal to significantly challenge the criminal charges and the underlying diagnoses. There is too much to lose from wealthy defendants and their legal teams deeply examining the medical records.

105. Finally, the child abuse enterprise has become what amounts to a self-perpetuating industry. Because the funding and maintenance of university departments, endowed chairs, case workers, and prosecution teams depends on ever increasing numbers of successful prosecutions, child abuse pediatricians are pressured to continually "find" victims of child abuse in order to maintain and grow the child abuse enterprise – just like for-profit corporation CEOs are continually pressured to increase sales.

**The Medical Community Attacks the Medical Validity of the SBS/AHT Enterprise**

106.    Starting around 2000, a number of medical researchers began to question the validity of the SBS/AHT hypothesis and the overall number of child abuse prosecutions in general, prompted in large part by its excessive use and abuse by the well-funded child abuse enterprise.

107.    Up to that point, many child abuse teams were able to secure SBS/AHT type convictions based on the existence of a baby's presentation with the SBS/AHT triad alone. In other words, babies would present to an emergency room with a brain bleed, retinal bleed and brain swelling – with absolutely no outward signs of injury or abuse – yet their parents or caregivers would be successfully prosecuted because of the sophistication and organization of the SBS/AHT enterprise and the lack of studies questioning the evidentiary basis for the prosecution's medical expert testimony.

108.    Around this time, several medical researchers became concerned that SBS/AHT was being overdiagnosed, and that the SBS/AHT hypothesis was resulting in a number of known false prosecutions and convictions. These false prosecutions were particularly troubling because they usually involved prosecution of the baby's parents or caregivers.

109.    These medical researchers began to publish papers questioning the validity of the SBS/AHT hypothesis.

110.    For example, a 2002 paper by forensic pathologist John Plunkett demonstrated, through video evidence, that a short fall from playground equipment could cause the triad of SBS/AHT symptoms and death after a short period of lucidity. This conclusion flew directly in the face of the SBS/AHT hypothesis, which was built on the idea that the triad of injuries was basically conclusive of SBS/AHT even if the infant had suffered falls or other medical injuries.

18

111.    Other medical studies confirmed that short falls could produce the triad of symptoms as could many non-traumatic medical conditions, including genetic disorders, metabolic disorders, blood disorders, clotting disorders, infections, toxins, poisons, nutritional disorders, and surgical complications.

112.    In 2003, a prominent biomechanical study by Michael Prange showed that the amount of shaking force necessary to cause an SBS/AHT-type brain injury to an infant would also necessarily result in catastrophic neck injury. Prange's conclusion was that the triad of SBS/AHT symptoms could not be caused by shaking unless the baby also had significant damage to his neck and ligaments.

113.    In 2006, the National Association of Medical Examiners withdrew its endorsement of the SBS/AHT hypothesis, calling the triad "not scientifically valid" and "mythical."

114.    In 2009, the American Academy of Pediatrics revisited its position on SBS/AHT and found, due to advances in medical understanding, that "there is no single or simple test to determine the accuracy of the [SBS/AHT] diagnosis."

115.    In 2010, a major study was published demonstrating that the mere presence of retinal bleeding is not diagnostic of SBS/AHT. *Retinal and Optic Nerve Sheath Hemorrhages Are Not Pathognomonic of Abusive Head Injury,* American Academy of Forensic Sciences (2010).

116.    In 2011, separate studies by Lantz/Couture and Barnes demonstrated that both subdural and retinal bleeding – 2/3 of the SBS/AHT triad – could be caused by short falls, further dissembling the medical and evidentiary foundation of SBS/AHT. *See Lantz et al, Evidence Based Case Report: Perimaculer Folds From Childhood Head Trauma,* 328 Br. Med. J. 754 (2004); Patrick D. Barnes, *Imaging of Nonaccidental Injury and the Mimics Issues and*

19

*Controversies in the Era of Evidence-Based Medicine*, 49 Radial. Clin. N. Am .205, 212 (2011).

117.    Barnes further noted that there is, "no evidentiary basis for reliably distinguishing between nonaccidental and accidental injury or the medical 'mimics.'"  As a result, he concluded that, "the triad of signs and symptoms that would lead to a Shaken Baby Syndrome diagnosis were and are no longer considered medically sound."

118.    In 2012, the very person who coined the term "Shaken Baby Syndrome," Dr. Guthkelch, expressed remorse for creating what he considered to be a runaway prosecution train:

> While society is rightly shocked by any assault on its weakest members and demands retribution, there seem to have been instances in which both medical science and the law have gone too far in hypothesizing and criminalizing alleged acts of violence in which the only evidence has been the presence of the classic triad or even just one or two of its elements.  Often, there seems to have been inadequate inquiry into the possibility that the picture resulted from natural causes.  In reviewing cases where the alleged assailant has continued to proclaim his/her innocence, I have been struck by the high proportion of those in which there was a significant history of previous illness or of abnormalities of structure and function of the nervous system, suggesting that the problem was natural or congenital, rather than abusive.  Yet these matters were hardly, if at all, considered in the medical reports.

119.    In 2017, a large study conducted by Lynøe *et al* in Sweden concluded that there is insufficient medical evidence supporting the conclusion that SBS is causative of the so-called triad of injuries.

120.    In 2018, Randy Papetti published a paper describing how unreliable the SBS/AHT diagnosis had become. *Papetti, The Forensic Unreliability of Shaken Baby Syndrome.*

121.    As a result of these and other studies as well as the recognition that the SBS/AHT enterprise had resulted in a number of false convictions and painful family separations, various medical organizations began to distance themselves from the SBS/AHT hypothesis based on the clear and emerging medical evidence against it.

122.    Even more recently, former supporters of the SBS/AHT hypothesis have begun to

actively back efforts to vacate criminal convictions based on earlier, flawed opinions that the presence of the triad is indicative of abuse. Among them was Dr. Guthkelch.

123.   The crumbling medical community support for SBS/AHT resulted in some courts revisiting prior convictions that were premised on flawed and medically unsupported expert testimony by those intimately involved in the SBS/AHT enterprise.

124.   For example, in *Roark v. Texas,* No. WR-56, 380-03, October 9, 2024, the Texas Court of Criminal Appeals vacated Andrew Roark's March of 2000 SBS/AHT conviction in a case involving his care of his girlfriend's 13-month-old child, BD. The child did not die but sustained permanent brain damage. Andrew Roark was sentenced to 35 years in prison. This ruling cites to a prior habeas finding:

> The habeas court found there was evidence presented by the State at Applicant's trial that shaking alone could cause the injury suffered by the child and that this injury is caused by shaking a child with extreme vigor that creates force similar to a high-speed motor vehicle accident or a fall from the second story of a building, as referenced in the previous section. The habeas court further found that there is no scientific validation to the claim that shaking alone can cause the injuries to B.D. The current science indicates there must be an impact. The evidence the court used to formulate this finding is based on changing testimony by State's witnesses in other trials and medical professionals who testified or provided affidavits.

The Texas Court of Criminal Appeals found, as did the habeas court, that medical science had evolved since the time of Roark's conviction. The Court took notice of the testimonies of State SBS/AHT experts as operating with an assumed certainty that is not commensurate with the past twenty years of scientific advancement and the uncertainty now inherent to medical evidence once solely attributed to SBS/AHT:

> But the jury would still hear experts on both sides arguing their position. B.D.'s injuries were consistent with abusive head trauma. An expert could still attest to the "consistent with" argument. Importantly, there would likely be no statements that it is "almost certainly" or "classically aligns with" a particular mechanism. This leaves the jury with little help. B.D.'s injuries were consistent with abusive head trauma, consistent with an acute-on-chronic rebleed from an accidental fall, and consistent with a spontaneous

rebleed that had reached the tipping point where there was no more room in her skull to hold the fluid. The mechanism of injury is the primary evidence in the case and the jury is left with criminal and non-criminal alternatives that are all consistent with the evidence.

125.    In *People of the State of Michigan v. Milton Lee Lemons*, Docket No. 163939, the Michigan Supreme Court overturned the 2005 conviction Milton Lemons on July 25, 2024. In its opinion, the Court addressed the double standard applied to SBS/AHT physicians opining on reliable testing and models versus that provided by representatives of government commissioned agencies pertaining to automobile and consumer product safety:

> We fail to understand why there is no "analytical gap" between expert opinion testimony and biofidelic and computer models in cases involving car crashes or product liability, but when those same models are relied on by experts in cases involving SBS/AHT, there is an insurmountable analytical gap between the models and the experts' testimony.

126.    Similarly, the Wisconsin Court of Appeals reversed the conviction of Audrey Edmunds in *Wisconsin v. Edmunds,* finding that "there has been a shift in mainstream medical opinion" regarding the SBS/AHT hypothesis since Ms. Edmunds's 1997 conviction.

127.    In    *Del Prete v. Thompson,* 10 F.Supp. 3d 907 (N.D. Ill. 2014), the court similarly overturned the conviction of a caregiver accused of murdering a baby through shaking, noting that the medical support for that theory had evolved considerably since the time of her conviction. It held,

> **[A] claim of shaken baby syndrome is more an article of faith than a proposition of science.**

128.    *People v. Bailey,* 144 A.D. 3d 1562 reached substantially the same result, as did *In re Pers. Restraint of Fero*, 367 P.3d 588 (Wash. App. 2015).

129.    In *State v. Nieves,* 302 A.3d 595, 620, (N.J. App. 2023), *aff'd* November 20, 2025, the court held, ("the evidence amply demonstrates that there is no general acceptance from the biomechanical community, and biomechanical testing has never proven the premise of

SBS/AHT, despite the hypothesis being grounded in biomechanical principles.").

130.   In *Illinois v. Valdez*, 18-CF-370 (Cir. Ct. Ill., August 26, 2025), the court held:

 Biomechanical studies have failed to verify the theory that shaking an infant/child alone can cause traumatic brain injury and its symptoms of subdural hematoma and retinal hemorrhage. In fact, existing biomechanical studies seem to refute the premise behind the diagnosis of SBS/ AHT. A majority of those in the medical field generally accept that violent shaking alone can cause SBS/AHT without scientific validation. It has not been proven by the State that the diagnosis of SBS/ AHT (shaking alone) is generally accepted in the field of biomechanical science, the critical scientific field that forms the basis for the diagnosis.

131.   This crumbling medical and legal support for the SBS/AHT hypothesis in recent years has threatened the lucrative and prestigious enterprise created and funded based on the SBS/AHT hypothesis.

### Child Abuse Pediatricians Respond with the "Helfer Playbook"

132.   Attacks on the validity of the SBS/AHT triad as a diagnostic tool constitute an existential threat to the practice of child abuse pediatrics.

133.   Child abuse pediatrics is a forensic practice. By definition, the child abuse pediatrician's job is intertwined with criminal investigation and prosecution.

134.   Because much of what child abuse pediatricians do is not reimbursable by insurance, the practice depends heavily on other funding sources directly tied to the prosecution of child abuse. All of those funding sources – legislatures, law enforcement, prosecutor's offices and private donors – all expect that the funding will produce tangible results in the form of criminal prosecutions.

135.   Prior to the recent attacks on the validity of the SBS/AHT triad as a diagnostic tool, child abuse pediatricians were able to maintain a high rate of success in child abuse prosecutions –and thus a successful funding of the enterprise --mainly because defending an SBS/AHT prosecution was so difficult.

23

136. Once the development of medical science began to threaten one of the foundations of child abuse pediatrics, a group of the most active child abuse pediatricians, including Defendant Harper, created what amounts to a playbook they use to counteract the existential crisis caused by this new medical evidence.

137. Although this playbook was initially developed for SBS/AHT cases, it was later adapted for use in nearly all types of suspected child abuse and has now become the standard playbook used on all sorts of presenting injuries, such as brain bleeds, broken bones, connective tissue injuries, bruising and failure to thrive.

138. Upon information and belief, the tenets and methods of this Playbook were developed at least in part by Harper and certain other child abuse pediatricians by and through their organization known as the Ray E. Helfer Society ("Helfer Society").

139. The Helfer Society is a nonprofit organization based in Illinois. Its stated goal is to support physicians specializing in the subspecialty of child abuse pediatrics.

140. Although much of what the Helfer Society does is legitimate, Harper and some of her associated child abuse pediatricians have used it as a tool for the exchange of fraudulent medical studies, fraudulent medical data, prosecutorial strategies and expert testimony strategies in order to keep the child abuse enterprise afloat in the face of multiple evidentiary attacks from the medical and legal communities.

141. Harper was at times relevant the Helfer Society President. Fellow child abuse pediatricians Debra Esernio-Jenssen, MD ("Esernio-Jenssen") and Barbara Knox, MD ("Knox"), are or were until recently active Helfer Society members.

142. As described in further detail below, working with and through one another and through the Helfer Society, Esernio-Jenssen, Knox, Harper and others developed the Helfer

24

playbook in order to sustain and grow the child abuse enterprise.

143. Upon information and belief, some of the data, materials and ideas used by Harper and others to create, adopt and carry out the Helfer playbook are stored at, were exchanged through, or otherwise electronically reside at the Helfer Society's headquarters in Illinois and thus were transmitted through interstate wires.

144. The Helfer playbook includes an agreed upon set of child abuse hospital and medical policies, protocols and customs that Helfer Society members, including Harper, work to impose on major hospitals and teaching institutions.

145. These policies, protocols and customs include:

a.    A policy or practice that babies or children with certain types of injuries, e.g. bone fractures, bruises, connective tissue injuries, brain bleeds or failure to thrive be automatically referred to the hospital or county's child abuse team;

b.    A policy or practice that once a baby's case is referred to the child abuse team, the CAP leads the baby's care, even though the CAP is typically a non-clinical, forensic physician;

c.    A policy or practice that once a baby's case is referred to the CAP, all medical and team collaboration ceases and no clinician is permitted to enter notes or reports in the medical record that conflict with the child abuse team's diagnoses;

d.    A policy or practice that, whenever possible, once a baby's case is referred to the CAP, the baby is moved from the hospitalist service to the surgical or trauma service because the trauma service is not normally staffed with

the same sorts of medical clinicians found in the hospitalist service, thus limiting the possibility of conflicting diagnoses from hospitalists unaware of the policy preventing documentation of differential diagnoses;

e. A policy or practice that once a baby's case is referred to the CAP, hospitalists and other clinicians are prohibited from providing family members with medical information or diagnostic impressions;

f. A policy or practice that the child abuse pediatrician be permitted to edit the notes and reports of other physicians to ensure that those notes and reports supported the child abuse diagnosis;

g. A policy or practice of omitting a discussion of head circumference measurement (or documenting the head circumference measurement) in babies with brain bleeds or brain fluid collections because babies with macrocephaly (abnormally large head size) tend to have a history of fluid collection in the brain that is not associated with trauma; and

h. A custom or practice that permits a CAP or the institutional leadership to bully clinicians that disagree with the above policies, procedures, protocols or customs.

146. These policies, procedures, protocols and customs ensure that the medical evidence used in subsequent child abuse prosecutions or parental termination proceedings is free of conflicting evidence that might be used to defend the child abuse allegations.

147. These policies, procedures, protocols and customs also enable the testifying child abuse pediatrician to later testify that the hospital's entire medical staff was in agreement with the child abuse diagnosis—without having to disclose that the rest of the medical staff was prevented

26

from documenting any disagreement.

148. These policies, procedures, protocols and customs also ensure that the medical information provided to the baby's accused family consists only of a child abuse diagnosis and not any competing diagnoses or differential diagnoses that the family could later use to defend themselves in subsequent child abuse proceedings.

149. These policies, procedures, protocols and customs also ensure that law enforcement and prosecutors are shielded from any medical evidence or information that may otherwise cause them to forbear from prosecuting the alleged abuser identified by the child abuse team.

150. Once the alleged abuser identified by the child abuse team is charged with a child abuse-related crime, the policy, practice, custom and procedure provides that the child abuse pediatrician shepherd law enforcement and the prosecutors through the civil termination of parental rights, "TPR," and criminal proceedings.

151. If the person accused of abuse later reaches a deal with prosecutors that includes what amounts to a coerced admission of abuse in exchange for return of the baby, Harper and her Helfer Society associates use this coerced admission or plea as a data point supporting their false narrative that their child abuse diagnosis was confirmed by the accused family member. In other words, the child abuse enterprise is perpetuated in part by prosecutors offering to return the baby if the obviously innocent family members agree to admit to some form of abuse – so that this data point can be used by Harper and other Helfer Society members as "proof" that their child abuse allegations were confirmed.

152. Because there are many situations in which trained medical professionals refuse to omit, shade, fabricate or conceal their medical opinions from the baby's parents, law

27

enforcement and the medical record, the Helfer playbook also depends in part on acts of extortion, bullying, threats against and retaliation against noncompliant physicians, hospital staff and child abuse workers, as described in greater detail below.

153. In order to describe and delineate the Helfer playbook developed and honed into practice by Harper and other Helfer Society members, Plaintiffs will identify facts describing how that playbook has been used by each of these Helfer Society members in other prosecutions and child abuse matters, as these form the pattern of racketeering crimes necessary to prove Plaintiffs' civil rights, RICO, RICO conspiracy and civil conspiracy claims.

**Harper developed and implemented these fraudulent and unlawful policies, procedures and customs at Fairview, UMP and the U of M Medical School for the purpose of manipulating medical data to support the child abuse enterprise; enrich the Defendants; and assist the HCAO in separating babies from their families and caregivers**

154. In 2015, the Minnesota Legislature passed sweeping legislation intended to improve and fortify the state's child abuse system. The new child abuse laws came into effect in July, 2015.

155. Those new child abuse laws created a $23.35 million Child abuse Grant to be annually distributed by the Minnesota Department of Human Services ("DHS") to county-level DHS agencies to fund expanded child abuse staffing and services.

156. DHS allocated the funds to each county according to the following criteria:

- Child population. Fifty percent of the funds must be distributed to county agencies based on the child population residing in the county.
- Screened-in reports. Twenty-five percent of the funds must be distributed based on the number of screened-in reports of child maltreatment in the county.
- Open child abuse case management. Twenty-five percent of the funds must be distributed based on the number of open child abuse cases in the county.

157. The child abuse grant was fixed at $23.35 million and has not increased or

28

decreased since its implementation. In order for any county to receive more funds from this grant, it would need to demonstrate increases in child population, screened-in reports and/or open child abuse management.

158. Because the child abuse fund is fixed, increased funding to one county requires a decrease in funding to one, some, or all other Minnesota Counties. Certain counties contract with certain hospitals. Much of the Southern part of the state contracts with Mayo. Many of the eastern counties contract with Minnesota Children's Hospital. Many contract with the defendants. Some smaller counties do not have a fixed provider. Due to this competition between health systems all the health provider defendants are incentivized to drive business to Hennepin County over other counties and other health providers

159. With Minnesota's passage of its massive bill funding the identification and prosecution of child abuse, the child abuse stakeholders in the metropolitan Twin Cities, including the U of M, Bremer, Hennepin County, HCAO, HH, Fairview and UMP were under significant pressure to alter their existing programs for diagnosing and prosecuting suspected child abuse in order to take advantage of the new funding sources.

160. These child abuse stakeholders chose Harper to run the new program.

161. When Harper arrived in 2014, child abuse stakeholders tasked her with expanding the child abuse program at the U of M and rebuilding the programs at HH and Fairview.

162. Bremer also directly monetized child abuse diagnoses in child fatality cases by offering substantial financial bonuses for the identification and prosecution of child abuse.

163. In order to accomplish the goal of monetizing child abuse diagnoses, Harper used her knowledge of and association with the Helfer Society to create the child abuse policies, procedures, customs and practices outlined above.

29

164.    Harper caused those child abuse policies, procedures, customs and practices to be implemented throughout U of M, UMP, Hennepin County, HH and Fairview.

165.    Harper's involvement in and leadership over Hennepin County's child abuse prosecution and civil child abuse programs brought immediate and positive financial, prosecutorial and political results to Hennepin County's child abuse stakeholders.

166.    From 2008 to 2015, an average of 1,739 children in Hennepin County were reported as alleged victims of physical abuse.

167.    In 2016—after Harper arrived and her "find something, get something" policies and procedures were put into place – 5,709 children in Hennepin County were reported as alleged victims of physical abuse, an increase of 228% over the previous eight-year average. In one calendar year, physical abuse cases in Hennepin County rose by 223%.

168.    By contrast, in 2016 the eight other metro counties – Anoka, Carver, Dakota, Ramsey, Scott, Sherburne, Washington and Wright – collectively reported only 3,804 alleged victims of physical child abuse.

169.    To put this in perspective, during this time the other eight metro counties had a collective child population of 504,807. Hennepin County's child population was only 271,399. The non-Hennepin metro counties thus reported 8 victims of alleged physical abuse per 1000 children, while Hennepin County under Harper's leadership reported 21 victims of alleged physical abuse per 1000 children. Harper thus helped Hennepin County exceed the other eight metro counties in alleged victims of physical abuse per 1000 children by 163%

170.    By 2016, the State of Minnesota and Bremer had put in place funding incentives that were tied to the number of children that could be identified as victims of physical abuse. In the case of Bremer, these incentives upon information and belief were tied to child fatalities.

171. This in turn resulted in entire medical and social work departments funded on the expectation that the number of physical abuse victims would continue to increase over time.

172. The flow of money tied to physical abuse findings also spilled over into the HCAO, which had fortified its child abuse prosecution team after the 2016 explosion in physical abuse cases.

173. In 2014, the HCAO total budget was $45,107,676. Of this number, $24,303,473 was allocated to criminal prosecution and $20,804,203 to civil matters including for juvenile court matters involving children in need of protective services ("CHIPS") and Termination of Parental Rights ("TPR") cases.

174. In 2018, the HCAO total budget was increased to $57,166,723. The total budget increase over 2014 numbers was 27%. Of this number, $28,498,433 was allocated to criminal prosecution and $28,668,290 to civil matters including CHIPS and TPR cases. The budget for CHIPS and TPR cases rose by 38% and, for the only time in a 10-year period, exceeded the criminal budget.

175. Moreover, upon information and belief, the policies, procedures and protocols put into place by Harper resulted in bonus payments by Bremer to the institutional defendants based on the number of prosecutions of persons accused of child abuse related deaths.

176. In short, the financial and structural existence of Hennepin County's child abuse program, which is part of a multidisciplinary team including healthcare workers, CPS workers, medical examiners, forensic interviewers, law enforcement, government case workers, guardians *ad litem*, HCAO civil attorneys and HCAO prosecutors, depends on Harper and her continuing financial, political and prosecutorial success.

177. During her tenure in Minnesota, Harper in turn has created, fostered and

maintained her own success and the purported financial and prosecutorial success of Hennepin County's child abuse prosecution system through a combination of autocratic power, fraud, extortion, bullying, evidence manipulation and perjured testimony, consistent with the tenets of the Helfer playbook as described above.

178. Because the policies, procedures and customs described above are fraudulent, unlawful, immoral, unethical, repugnant and contrary to all reasonable medical and scientific principles, those policies, procedures and customs are by necessity concealed from public disclosure and in fact are concealed from most of the UMP hospitalists who work at HH and Fairview.

179. The institutional defendants have many specific reasons for concealing these policies, procedures and customs, including:

a. The policies, procedures and customs are contrary to medical and scientific methods;

b. The policies, procedures and customs are evidence of fraud, unlawful conduct, conspiracy, evidence tampering and racketeering;

c. The policies, procedures and customs violate Minnesota's consumer protection statutes;

d. The policies, procedures and customs violate the rights of children's parents;

e. Disclosure of the fact that two of Hennepin County's primary pediatric hospitals have a policy of concealing, fabricating, manipulating and omitting important medical evidence from the record of a suspected child abuse victim would have profound effects on Hennepin County's child

abuse and child abuse system as a whole, since evidence manipulation fraudulently taints the entire law enforcement and judicial process;

f.    Disclosure of the fact that two of Hennepin County's primary pediatric hospitals have a policy or custom of concealing their denial of important or sometimes lifesaving clinical care to sick babies who are tagged with a suspected child abuse diagnosis would create a legal, financial, political and public relations nightmare for those hospitals;

g.    Disclosure of the fact that two of Hennepin County's primary pediatric hospitals have a policy of preventing sick babies who are tagged with a alleged (but medically unfounded) child abuse diagnosis from accessing the clinical care their parents sought by bringing the baby to the hospital would create a legal, financial, political and public relations nightmare for those hospitals;

h.    Disclosure of the fact that two of Hennepin County's primary pediatric hospitals have a policy of using sick babies who are tagged with a suspected (but medically unfounded) child abuse diagnosis as forensic evidence instead of patients would create a legal, financial, political and public relations nightmare for those hospitals;

i.    Disclosure of the fact that false allegations of child abuse are lodged to cover up medical malpractice would create a legal, financial, political and public relations nightmare for those hospitals; and

j.    Disclosure of the fact that sick babies who are tagged with a suspected (but medically unfounded) child abuse diagnosis remain in the hospital for

33

forensic evidence collection would subject HH, Fairview/Fairview to potential Medicaid/insurance fraud investigations since, upon information and belief, HH, Fairview/Fairview bill Medicaid or insurance companies for clinical care that is not actually provided in the forensic evidence gathering environment the babies are kept in.

180. Apart from the policies, procedures, customs and coercive threats and bullying tactics described above, Harper also supports and propagates her false child abuse narrative by and through the creation of false data that she uses to generate "medical studies" supporting her child abuse enterprise.

181. As set forth above, by creating and implementing hospital policies, procedures and customs that virtually ensure that Harper and her team will be given exclusive medical control over babies admitted to the hospital with brain bleeds or similar conditions, Harper is able to singlehandedly decide, without medical or legal interference, which parents or caregivers will be charged and prosecuted for child abuse.

182. By wielding this unchecked medical and legal power, Harper is able to ensure that if she decides that someone abused a baby, that person will lose custody of the baby and any other children in his or her household and will face a high likelihood of either going to prison or plead guilty to a lesser offense related to child abuse.

183. The institutional Defendants have also given Harper and other CAPs *carte blanche* to engage in what amounts to child trafficking by and through permitting them to manipulate medical evidence in order to cause a baby to be taken from its parents and reassigned to another family.

184. In so doing, the institutional Defendants have conspired with the HCAO and law

34

enforcement so assist them in bringing and prosecuting child abuse cases that are free of the types of exculpatory medical evidence normally found in medical charts that are not generated in the face of policies that permit and encourage tampering and manipulation.

185. Each admission, juvenile court determination, maltreatment finding, or conviction or guilty plea creates a data point for Harper and other Helfer Society members to use to convince juries that their medical opinions are substantiated.

186. These data points are exchanged by and between Harper and other members of the Helfer Society through the use of interstate wires.

187. Juries are told by Harper that the fact that most or all of the people accused of child abuse by Harper have either been convicted or have pled guilty substantiates the medical evidence supporting her child abuse diagnosis.

188. These fraudulent data points are particularly important to Harper and members of the Helfer Society since the true medical studies – the ones that are peer reviewed and based on non-fraudulent data – demonstrate that some of their diagnoses, including the SBS/AHT diagnosis, are not legitimate.

189. Apart from the fact that Harper's academic fraud is created from the lives of those falsely accused of heinous crimes, what also makes Harper's academic fraud particularly egregious is the fact that it is sponsored by and made possible by these esteemed institutional defendants, who have chosen money and funding over truth and the protection of babies, families and concepts of medical science and teaching.

190. Another way Harper implements the Helfer Playbook throughout the Hennepin County medical community is by editing and modifying the reports of other physicians to promote and support diagnoses of SBS/AHT and other forms of child abuse.

35

191.    In the case of *Kallie Raye Budin and Michael Jeffrey Budin*, Harper specifically admitted under oath that as a matter of policy and practice she edits and modifies reports and medical records of other physicians who have provided care to patients Harper consults on.

192.    As set forth in the case of *Reynolds v. Harper et* al, Harper edited and manipulated medical records in order to make it appear as if GC had been abused by Sylwia Reynolds, even though all objective evidence proved the contrary.

193.    Harper makes these edits and modifications to other physician reports without clearly identifying her edits and/or contributions. The purpose of the policy and practice of giving Harper the ability to "ghost edit" other physician reports is so Harper can craft precise medical evidence that makes it easier to prosecute intended child abuse defendants.

194.    When she is finished with the edits, Harper gives the reports back to the physicians for them to sign and file them using their own names, in order to make it appear as if the physicians created the reports on their own and without assistance.

195.    Harper and the Helfer Society also create and disseminate teaching materials in which they advise medical professionals to avoid using a patient's electronic medical record to document or exchange medical information that may contradict a child abuse diagnosis because data entered into electronic medical records cannot be permanently deleted.

196.    Consistent with the Helfer playbook, Harper's editing, modification and policy of teaching colleagues to avoid the use of electronic medical records to record data adverse to a child abuse diagnosis necessarily requires the agreement and participation of the physicians whose reports are being edited or censored.

197.    Harper is able to extract this agreement and participation – even though it is wrongful and unethical – precisely because Harper wields enormous power over the other

physicians' professional futures and livelihoods, consistent with the way other child abuse pediatricians implement the Helfer Playbook, as described below.

198. When a physician refuses to follow Harper and the institutional defendants' implementation of the Helfer playbook, he faces discipline or termination,.

199. Another Helfer playbook tactic Harper regularly uses is to shade or actually fabricate her testimonial history in order to make it appear to criminal juries that she is unbiased and provides expert services to both the defense and prosecution, which is not the case.

200. Upon information and belief, Harper has testified exclusively on behalf of state prosecutors in cases involving physical child abuse for over 24 years. During this time, Harper has averaged 6 to 12 court appearances as an expert witness per year, or well over 200 trial testimonies. On many of those occasions, Harper has been asked about her testimonial history.

201. As part of her implementation of the Helfer playbook, Harper has learned how to avoid being pinned down on her history of giving expert testimony on behalf of defendants criminally charged with SBS/AHT or any other form of physical abuse of children. She does this through a combination of evading the question; answering a different question than the one asked; refusing to give actual case names; and by giving false testimony about her testimonial history.

202. In *Minnesota v. McMorris,* for example, Harper testified under oath on December 20, 2017, that she had never testified on behalf of a defendant in a child abuse case.

203. On July 17, 2019, Harper contrarily testified in *Minnesota v. Laurie Ann Gregor* that she gave expert testimony on behalf of a child abuse defendant while she was medical director of Driscoll Children's Hospital in Corpus Christie, Texas – which was prior to the *McMorris* testimony.

204. On November 11, 2021, Harper testified in *Wisconsin v. Kathryn Campbell* that

37

she had testified on behalf of child abuse defendants "probably about a half dozen or a dozen times," which is false.

205.    On January 9, 2023, Harper testified in *Minnesota v. Jordan William Carter* that she had appeared in court on behalf of child abuse defendants twice: once involving child pornography and once involving sexual assault in Pennsylvania.

206.    On December 15, 2023, Harper testified in State of *Wisconsin v. Joanna Ford* that she had only testified once for a criminal defendant, and that had been in Pennsylvania, though she was uncertain of the date.

207.    Harper and her co-employer, UMP, also arrange for Harper's expert witness fees to be paid to UMP so that Harper can falsely imply to the jury that she receives no compensation or benefit for giving her expert testimony.

208.    Harper also implements the Helfer playbook by misrepresenting accepted medical science as it pertains to accidental TBI caused by short falls and stairway falls.

209.    For example, in *State of Minnesota vs. Jordan William Carter*, 69DU-CR-20-3788, Harper testified for the prosecution that children who experience short falls and stairway falls "…have very few injuries and minor injuries."

210.    Harper knew, when she gave this testimony, that it is well established, including by and through a study by the Journal of Safety Research, that "Falls are the leading cause of nonfatal emergency department (ED) visits among children aged birth to 14 years, accounting for 2.4 million visits annually, and the leading cause of traumatic brain injury (TBI) visits for children in the 0-4 year age group… children 4 years and younger are more likely to sustain head injuries, be hospitalized, or die from falls… Studies examining injury circumstances and location in younger children, report almost twice as many children are hospitalized due to falls from

38

furniture than from stairs, but those children who fell from stairs are more likely to sustain head injuries."

211.    In the *Carter* case, the child Jordan Carter allegedly shook fell down a flight of basement stairs to a cement floor covered by thin linoleum. The boy exhibited symptoms of traumatic brain injury shortly thereafter, which included loss of appetite, vomiting, lethargy, and unusual sleep patterns. The next day at approximately 5:35 pm, the child lost consciousness and stopped breathing. Two days later, the boy died.

212.    Through her use of the Helfer playbook, Harper was able to convince a jury that the baby's death was caused by Carter's shaking, and not by falling down a flight of stairs.

213.    Harper also implements the Helfer playbook by intentionally omitting exculpatory/exonerating medical information from her consultative reports.

214.    For example, in the *Reynolds v. Harper et al* case, Harper intentionally omitted a number of exculpatory medical facts and diagnoses from her reports and communications in order to support her fictitious child abuse diagnosis.  Among other things, Harper:

      a.    Concealed the fact of GC's fall history;

      b.    Concealed family reports of symptoms consistent with a TBI;

      c.    Avoided providing differential diagnoses;

      d.    Concealed the fact of GC's abnormally large head circumference;

      e.    Concealed GC's genetic blood clotting disorder;

      f.    Concealed the fact that GC was prescribed contraindicated medications at the hospital; and

      g.    Manipulated Dr. Sarah Lucken's child abuse report without attribution.

215.    Harper has taught and continues to teach fellows of the Child Abuse Pediatrics

39

Fellowship Program at the Center and prosecutors the Helfer Society's program on how to identify and omit exculpatory medical information from consultative reports and criminal complaints.

216. For example, upon information and belief, Jada Ingalls, DO, a June, 2020 graduate of Harper's fellowship program, omitted head circumference measurement diagnostic of macrocephaly from her consultive report in *State of Minnesota vs Michelle Marie Kleindl*, 06-CR-22-196.

217. On information and belief, Harper also implements the Helfer playbook by specifically targeting child abuse diagnoses toward blue collar, low income and minority caregivers because they lack the financial resources to effectively expose her false and fraudulent methodology.

218. For example, on December 1, 2022 a daycare provider made a report of potential child abuse concerning her client Shablya Ferba's two toddlers. Shablya is Black.

219. The day care provider reported that Shablya's 19-month-old had red marks on his cheek.

220. Dawn Peasha, the Child Protection Investigator ("CPI") assigned to the case by Hennepin County followed county procedure and practice and forwarded images of the 19-month-old child to Fairview's medical professional on duty.

221. Fairview's medical professional reviewed the case and determined it did not meet criteria for moving forward with a child abuse investigation.

222. The next day, a nurse practitioner under the direction of Harper at The Center reviewed the determination by the on-duty medical professional and overruled it. She then directed the CPI to order Shablya to bring the children into The Center. Shablya declined.

223.    The CPI then told Shablya that if she did not bring the children in by noon that day they would be removed. Shablya complied.

224.    The Center conducted the first interviews of the parents without either the CPI or police officer present. The parents and an older child all indicated that the 19-month-old and 33-month-old siblings were playing and then started bickering. Mother was running errands and Father was not in the room, but they assumed the 33-month-old hit the 19-month-old with a toy or the 19-month-old fell.

225.    The 19-month-old had red marks on their face as a result. The Center found no fractures and no injury except for the red marks on the face. The Center opined that something about the spacing of the scratches indicated an adult had caused it, but never provided any medical or scientific basis for their ability to deduce the age of the perpetrator by the shape of a minor scratch mark that did not break the skin.

226.    Based on the Center's finding, the children were removed from both parents' care for three days and then returned to solely mother's care.

227.    A recent study by the American Bar Association determined that Hennepin County has one of the highest child protection racial disparities in the nation. In response, Hennepin County started a pilot program with Village Arms. The purpose of the program was to reduce the county's nation-leading racism concerning child protection issues.

228.    Shablya self-referred her case to the Village Arms program and on December 8, 2022, was assigned a new Village Arms-based CPI, Binta Barry-Toe.

229.    A St. Louis Park Police Officer, Bruce London, and CPI Barry-Toe jointly conducted interviews of all three of Shablya's children as well as both parents. The only witness old enough to recount the interaction between the toddlers was their six-year-old who was

41

interviewed at school.

230.    The six-year-old described that the toddlers grabbed at each other's hair and faces and the 19-month-old was scratched as a result. The parents and six-year-old's stories were consistent that the red marks occurred because of a fight likely over a toy between the toddlers. Both the CPI and Police Detective closed their cases without a finding of abuse or a criminal charge.

231.    Using Harper's power and clout, Harper's nurse practitioner contacted Ms. Barry-Toe's supervisors and pressured them to order Ms. Barry-Toe and Detective London to reopen their cases and to find abuse.

232.    Detective London responded to this directive by changing his draft report to reflect that he did not find the parents' story credible and that he agreed with the Center that abuse occurred, even though that was not his true opinion.

233.    On December 13, 2022, after consulting with The Center, Ms. Barry-Toe's supervisor sent Ms. Barry-Toe a series of leading questions to ask the six-year-old to support The Center's child abuse determination.

234.    Ms. Barry-Toe raised concerns that the questions did not comply with Minnesota Administrative Guidance from the Department of Human Services and Department of Youth and Family Services that specifically forbid those types of questions because they result in false allegations. Nonetheless, Ms. Barry-Toe was directed to ask the improper, leading questions based on pressure from The Center.

235.    Despite being asked the improper leading questions, the six-year-old maintained the same story. Additionally, the day care providers agreed that sometimes the toddlers scratch each other when fighting over toys.

42

236.    On December 21, 2022, Ms. Barry-Toe reinterviewed the nurse practitioner at the Center who reaffirmed that the length and width of the scratches must have been caused by an adult because a child would lack the necessary force to cause a bruise of that length.

237.    Ms. Barry-Toe took conscientious notes of her interactions with the Center, county management, and Village Arms.

238.    The Village Arms liaison voiced disagreement with the County's decisions. The Village Arms liaison on the case was removed as a result.

239.    The County thereafter pressured Ms. Barry-Toe to incorporate specific false findings demanded by The Center. Among other things, Human Services Area Director Allison Boynes and Children and Family Services Director Kwesi Booker (the top manager over all of child protection) pressured Ms. Barry-Toe to alter her notes and findings to comply with The Center's theory that the child was scratched by an adult.

240.    On January 14, 2023, Ms. Barry-Toe was ordered to sign a petition, a proposed *ex parte* order for immediate custody, and a maltreatment finding based on the Center's findings and Detective London's doctored report. Ms. Barry-Toe refused.

241.    Director Booker and Area Director Boynes then instructed Ms. Barry-Toe, in writing, to delete her communications from the Social Services Information System ("SSIS") by four o'clock that day or be subjected to disciplinary action.

242.    SSIS is federally mandated, funded, and regulated under 42 U.S.C. § 674. It is administered by the State and subject to State data practice laws and rules. SSIS notes form the paper trail with which counties justify reimbursement for federal and state funds. SSIS notes are mandated to be discovered by a standing order in Hennepin County and are frequently used for impeachment by parent attorneys.

243.    Hennepin County has built an automated system to provide the records directly to parent attorneys once the case is filed. Therefore, time was of the essence to doctor Ms. Barry-Toe's notes before they were automatically provided to S.F.'s court appointed counsel. Ms. Barry-Toe refused to delete her notes or to swear to false statements. She left her job that day in response to the repeated pressure to break the law.

244.    Rebecca Schultz, Ms. Barry-Toe's supervisor, swore out the petition instead.

245.    The County fraudulently and falsely affixed Ms. Barry-Toe's name to a maltreatment determination, without her knowledge or permission, which was countersigned by her supervisor.

246.    Ms. Barry-Toe was later subpoenaed for testimony at the fair hearing in administrative court regarding that finding, which is how she came to learn her name was affixed to the maltreatment finding she refused to sign.

247.    Via the discovery and testimony produced at the fair hearing it was revealed that Ms. Barry-Toe's electronic signature was fabricated and forged through use of computers, interstate wires and the Adobe software program.

248.    Computers, interstate wires and the Adobe software program were also used to manipulate Ms. Barry-Toe's original notes and to obscure her conversations with the police and the Center.

249.    Shortly after Ms. Barry-Toe's testimony and the revelation of doctored evidence, the Village Arms pilot program was ended by Hennepin County.

250.    Each of the remaining social workers were reassigned to mainstream child protection work. Most have since left their jobs.

**Debra Esernio-Jenssen, MD**

251.    Esernio-Jenssen is another one of the co-conspirators and Helfer Society members who helped develop the Helfer Playbook used in turn to develop and implement the child abuse diagnosis and prosecution policies, practices and standards used by Harper, U of M, Fairview/Fairview, UMP, Bremer, HH, Hennepin County and the HCAO.

252.    Esernio-Jenssen is a close colleague and associate of Harper. Esernio-Jenssen wrote a nomination letter for a Helfer Society Outstanding Teaching award given to Harper in 2022. Esernio-Jenssen and Harper have also presented together at numerous seminars and have shared research and publications.

253.    In order to support, further and maintain the SBS/AHT enterprise for herself and her co-conspirators, Esernio-Jenssen has employed the Helfer Playbook through a long and well-documented pattern of falsifying and shading medical documents, falsifying medical diagnoses, and rendering false testimony in order to obtain or attempt to obtain child abuse convictions.

254.    Esernio-Jenssen's overzealous, unprofessional and fraudulent work in obtaining child abuse convictions has earned her significant expert witness fees and has rewarded her with a number of prestigious academic, political and teaching hospital appointments over the years.

255.    Esernio-Jenssen was an SBS/AHT pediatrician in New York in the early 2000s. During that time, she found and caused the prosecution of numerous innocent caregivers and parents of children who were injured by accidents or underlying medical conditions.

256.    By the mid-2000s, New York courts began finding, with regularity, that Esernio-Jenssen was not an objective physician but was instead an advocate for the prosecution who was willing to falsify testimony in order to support SBS/AHT prosecutions.

257.    For example, on August 31, 2005, Judge Friedman of the Queens County Family Court found that Esernio-Jenssen's opinions in a case seemed to be racially and culturally

45

motivated, noting, "Dr. Jenssen's emphasis on ethnic and religious issues often distasteful." Judge Friedman found, "Dr. Jenssen is a pediatrician, not a psychiatrist or qualified social worker," and therefore, "[i]t [wa]s not clear to what extent her views on the relationship between the parents and their presentation should be counted as expert."

258.   Judge Friedman also found that Ersenio-Jenssen's testimony was not credible; that Ersenio-Jenssen lacked objectivity; and that there was no evidence of abuse, notwithstanding Ersenio-Jenssen's insistence that there was.

259.   Judge Friedman found it concerning that Dr. Jenssen so rigidly rejected any alternative to her chosen scenario despite advice from her own child abuse team, "Given these movings back and forth, the Court gained the impression that Dr. Jenssen had formed an intuitive judgment, and that she would make almost any argument to back it up."

260.   In December 2005, another New York family court judge, the Honorable Edwina G. Richardson, found that Esernio-Jenssen was "clearly mistaken in her diagnosis that the child suffered from subarachnoid bleeding" when in fact the child's "CAT scan was negative for subarachnoid bleeding." Judge Richardson noted that Esernio-Jenssen "made her finding of Shaken Baby Syndrome despite the fact that the child had no skull fracture, no bruises, no broken bones, no retinal hemorrhages, no other signs of abuse, neglect or trauma typically associated with Shaken Baby Syndrome, and no other suspicious conditions."

261.   Similar to Judge Friedman's observations, Judge Richardson stated, "It appears to this court that Dr. Jenssen [sic] came to an initial conclusion, then worked very hard to justify and defend it. She appeared unusually invested in defending her Shaken Baby Syndrome diagnosis."

262.   Remarking further on Esernio-Jenssen's lack of credibility, Judge Richardson stated, "The court had a number of serious concerns worth noting regarding the testimony

46

presented by Dr. Jenssen [sic] in this case. Not only does the court question and discredit her medical findings in light of the highly competent and credible testimony of [another physician], but the court questions her testimony for other reasons as well."

263.    According to Judge Richardson, "at a minimum, Dr. Jenssen [sic] was being unreasonably judgmental and, at worst, culturally insensitive." The court further observed "Dr. Jenssen [sic] was unusually defensive, argumentative, and condescending to counsel who questioned her appropriately. She was also confrontational and combative in providing what should have been professional expert testimony. One would expect such a high level of emotion from a party to the proceeding or a lay witness but never from one who has testified in as many cases as Dr. Jenssen has."

264.    Judge Richardson concluded that "the child's injuries were caused by natural conditions and were not caused by violent shaking" and went so far as to proclaim that the Court could "confidently find that there was no violent shaking of the child here. That is, there was no neglect and no abuse. The parents and child are clearly part of a loving, intact family. The court finds that the parents did nothing accidentally or deliberately to hurt their baby. They did not individually or jointly hurt this baby and then try to cover up his injuries."

265.    Judge Richardson went on:

> The court is saddened by what has happened here as a result of an insufficiently substantiated accusation of Shaken Baby Syndrome. Dr. Jenssen's [sic] failure to identify and adequately rule out the various potential causes of bilateral subdural hematomas in this child, and her misdiagnosis of the child as suffering from subarachnoid bleeding, caused her to jump to many conclusions including the conclusion that the child's injuries were caused by violent shaking. There are far too many abused children in our society. This court's role is to try to ensure, to the extent possible, that children are protected from abusive and neglectful parents. It is tragic that a medical misdiagnosis and an inappropriate rush to judgment has resulted in these loving, caring, dedicated parents being separated from their sickly child.

*In the Matter of V.L.*, Docket No. NA- 20759/03, Decision and Order (Queens Cty. Fam. Ct. Dec. 21, 2005).

266.    Another New York Family Court, determined, in a written opinion dated May 19, 2009, that Esernio-Jenssen falsely diagnosed "non-accidental abuse head trauma" ("NAHT") despite clear medical evidence that the child was suffering from a brain infection (meningitis) and opinions of multiple other physicians that the child was suffering from meningitis – and not child abuse. *In the Matter of A.*, Docket No. NA-17916/08, Decision (Kings Cty. Fam. Ct. May 19, 2009).

267.    Like the other family court judges, Judge Ruiz found Esernio-Jenssen lacked credibility, "Dr. Jenssen's testimony that the child suffer[ed] from an episode of NAHT preceding his first hospital admission casts serious doubt on the reliability of her entire expert testimony." The court further found, "Three of the four medical experts who testified as to the child's diagnosis and treatment agreed, to varying degrees, the child had either viral or bacterial meningitis during his first hospitalization. Only Dr. Jenssen, Petitioner's expert during their case in chief, opined the child suffered from NAHT during this first hospitalization."

268.    Esernio-Jenssen was also named as a Defendant in no less than three federal lawsuits brought in the United States District Court for the Eastern District of New York on the basis of misdiagnosing child abuse, falsely accusing parents of child abuse, and causing the unnecessary removal of children into protective custody. Those lawsuits *are Estiverne et al v. Goodwine et al.*, C.A. No. 06-06617- NG-RLM (E.D.N.Y.); *V.S. et al v. Muhammad et al.*, C.A. 07-00213-CBA-JO (E.D.N.Y.), and *Denes Q. et al v. Caesar et al.*, C.A. 07-cv-01281-CBA-JO (E.D.N.Y.).

269.    The *V.S.* and *Denes Q.* cases were both assigned to the Honorable Dora L.

Irizarry, who issued a joint decision on September 30, 2008. In that decision, Judge Irizarry found, "In both complaints, medical defendant Dr. Esernio-Jenssen is accused of reporting incorrect diagnoses of the infant's injuries that she knew or should have known to be false, or reported in reckless disregard for the truth. This accusation is supported in the V.S. matter by the additional fact that full-body X-rays she ordered for the infant T.S. did not appear to reveal any skull fracture or brain hemorrhage despite her report to the contrary. The apparent contradiction between the outcome of the X-ray and her report raises plausible inference of bad faith that could overcome the good faith presumption."

270. In 2010, while some of the above actions were pending, Esernio-Jenssen resigned her positions in New York and moved to Gainesville, Florida. There, she assumed the position of Medical Director of the Gainesville Service Center of the Florida Department of Children and Families ("DCF Center"). Medical services were provided to the DCF Center by the University of Florida ("UF"). Esernio-Jenssen was an employee of UF and the medical director of its child abuse team ("UF CPT").

271. While in Florida, Esernio-Jenssen was the subject of numerous complaints, concerning, *inter alia*, her findings of alleged child abuse. See, e.g., https://www.wfmz.com/news/area/lehighvalley/a-look-at-the-history-of-dr-jenssen-the-pediatrician-accused-of-overdiagnosing-medical-child/article_f7566996-438d-11ee-8ce5-6ba6e636e457.html

272. In January 2014, a Florida mother ("Florida Mother") brought her then 5-year old son to the DCF Center, not as a victim of abuse himself, but as a supporting witness. She was told it was a witness interview. Esernio-Jenssen interviewed the boy while the Florida Mother remained in the lobby. Separating children from parents is typical of "interviews" conducted by

Esernio-Jenssen.

273.    During his interview, the boy became the victim of abuse by Esernio-Jenssen.

274.    Jenssen outrageously ordered the child to strip naked, spread eagle, and photographed his entire body, including his genitals. When the child returned to his mother after the interview, he was crying, visibly shaken, and traumatized.

275.    As a result of Esernio-Jenssen's extreme and outrageous conduct against her son, the Florida Mother notified UF, Governor Rick Scott, and also filed a formal complaint against Esernio-Jenssen and other agents of the Florida Department of Health. It was the Governor who insisted the complaint be investigated by the Office of Inspector General ("OIG").

276.    In connection with its investigation, the Florida OIG provided a Preliminary Inquiry Memorandum ("PIM"), detailing the Florida Mother's complaint and the OIG's findings. The PIM focused on the conduct of state employees and does not identify Esernio-Jenssen as a subject of the complaint in the heading, but Esernio-Jenssen's conduct is discussed throughout the PIM.

277.    Specifically, the OIG notes in the PIM that Esernio-Jenssen had been the subject of a prior complaint in January 2014 for her clinical practices – more particularly, for false allegations of child abuse related to a child who had suffered a ruptured spleen.

278.    UF thereafter reassigned Esernio-Jenssen to a non-CPT position.  Given that the entire reason for Esernio-Jenssen's presence at UF was for the identification and prosecution of child abuse, her removal from CPT was the equivalent of losing her job.

279.    Shortly after her reassignment to a non-CPT role, Esernio-Jenssen left UF and Florida entirely.

280.    In August 2014, Esernio-Jenssen moved back to the Northeast, taking a position

as the director of the Lehigh Valley Health Network's ("LVHN") John Van Brakle Child Advocacy Center in Pennsylvania.

281. Esernio-Jenssen's tenure at LVHN was marked by continuing misconduct aimed at promoting the SBS/AHT enterprise as she had done in her previous positions.

282. The child abuse caseworkers who worked with Esernio-Jenssen at LVHN described a toxic work environment and described Esernio-Jenssen as a bully. They characterized the atmosphere as "a frenzy" with Esernio-Jenssen verbally attacking and humiliating caseworkers who disagreed with her about her identification and diagnosis of child abuse.

283. One caseworker recalled being forced to accuse a mother of Munchausen Syndrome by Proxy after being grilled for over an hour by Esernio-Jenssen on the speaker phone – with a Case Manager, Supervisor, others present in the room – until the caseworker finally relented and said "fine." One caseworker remarked that Esernio-Jenssen "thought she was everybody-the lawyer, the cops, she was everybody."

284. While at LVHN, Esernio-Jenssen regularly exceeded the scope of her practice by writing the recommendations of how child abuse prosecutions should be handled, such as removing children from their parents.

285. On another occasion, when a caseworker disagreed with Esernio-Jenssen, Esernio-Jenssen locked herself and a child in a medical examination room and refused to come out until the caseworker agreed to file for custody.

286. According to a series of later lawsuits filed against Esernio-Jenssen, including multiple parents, patients, and co-workers complained about Defendant Esernio-Jenssen's false accusations, false and unqualified diagnoses, her bullying and autocratic behavior, and her racial insensitivity.

287.    In these later lawsuits filed against Esernio-Jenssen, including from approximately 2020 to 2022, Esernio-Jenssen was placed on an internal improvement plan by LVHN because of repeated false accusations of child abuse and Munchausen Syndrome by Proxy.

288.    Esernio-Jenssen's continuing misconduct eventually rose to such a level that it garnered the attention of Lehigh and Northampton County officials as well as local and national news media beginning in the summer of 2023.

289.    On August 23, 2023, the Lehigh County Controller Mark Pinsley released a 99-page report entitled, "The Cost of Misdiagnosis" ("Report"), which claimed that there is a "potential systemic overdiagnosis" of medical child abuse (also known as Munchausen Syndrome by Proxy) in the Lehigh Valley. Report at 6. More specifically, the Report stated:

> An analysis uncovered alarming statistics that the Northeast region of Pennsylvania diagnoses 40% of the state's Munchausen syndrome by proxy cases ("MSBP") (used to signify medical child abuse (MCA), despite having just 11 % of the under-18 population. This disproportionate rate points to potential systemic overdiagnosis of this rare disorder.

290.    The Report also recognized a pattern in the false diagnosis of not only MSBP, but other forms of child abuse:

> This audit initially began as an investigation into the costs associated with the potential misdiagnosis of Munchausen Syndrome by Proxy. However, it quickly became apparent that the inquiry needed to include other areas, such as shaken baby syndrome, various forms of head trauma, and other rare diseases frequently misclassified as child abuse. Moreover, the reader must understand that our investigation did not reveal a few anomalies attributable to human error. Instead, our analysis showed statistical anomalies suggesting a pattern that requires further investigation.

291.    Not coincidentally, this uptick in false child abuse diagnoses coincided with Esernio-Jenssen's tenure at LHVN during which she introduced a screening protocol called "Every child, every time."

292.    Initially, Esernio-Jenssen's "Every child, every time" protocol was implemented to screen all trauma patients under 15 years of age, but within 9 months, it was "extended to all

52

patients admitted to the children's hospital."

293. Troublingly, this protocol appears to have been implemented regardless of any signs of child abuse in the admitted patients and without regard to the upheaval to families caused by baseless child abuse inquiries and investigations resulting from its overzealous screening tactics.

294. News agencies quickly noticed the correlation between the overdiagnoses at LVHN and Esernio-Jenssen and her policies, and began reporting on it, as well as reporting on the heartbreaking stories of Lehigh Valley residents who were falsely accused of abuse by Esernio-Jenssen.

295. As a result of the numerous complaints and lawsuits against Esernio- Jenssen, she was removed from her position at the advocacy center.

296. Esernio- Jenssen is still active in the Ray Helfer Society and continues to maintain and further the SBS/AHT enterprise through her work as an expert witness.

### Barbara Knox, MD

297. Knox is another co-conspirator and Ray Helfer Society member who has helped Harper Esernio-Jenssen and others develop the Helfer Playbook used to create and implement the child abuse diagnosis and prosecution policies, practices and standards used by Harper, U of M, UMP, Bremer, HH, Fairview/Fairview Hennepin County and the HCAO.

298. Knox is also a close associate of Defendant Harper.

299. Knox was previously a professor of pediatrics at the University of Wisconsin ("UW"). In that role, and similar to the way Esernio-Jenssen operated, Knox maintained, furthered and participated in the SBS/AHT enterprise by finding supposed victims of SBS/AHT and making knowingly false reports of SBS/AHT against the alleged victims' caregivers and

parents.

300.    Using the Helfer Playbook that she, Harper and Esernio-Jenssen helped to develop, Knox engaged in a pattern of fraudulent and extortive conduct in order to support and maintain the enterprise, including, but not limited to falsifying medical records in order to support an SBS/AHT hypothesis and resulting prosecution; bullying other physicians and colleagues into falsifying or shading medical records or diagnoses in order to support an SBS/AHT hypothesis and resulting prosecution; and retaliating against other physicians and colleagues who refused to falsify or shade medical records in order to support an SBS/AHT hypothesis and resulting prosecution.

301.    Knox's fraudulent and extortive conduct resulted in a pattern of false accusations of child abuse against the parents and caregivers of infants under her jurisdiction in Wisconsin.

302.    Soon after arriving at the UW in 2006, Knox caused the prosecution of Jennifer Hancock, a Verona day care provider who was convicted of killing an infant in her care.

303.    Knox caused the prosecution by in part pressuring a colleague, Dr. Michael Stier, to falsely conclude that the child was abused, which in turn falsely shaded his testimony at Hancock's 2009 trial.

304.    During Hancock's post-conviction motion hearing, Stier said he felt "peer pressure" to falsely conclude that the baby suffered a skull fracture and that it was caused by abuse.

305.    Stier said he has witnessed brain bleeding similar to the child in other people who died from natural causes, accidents or drug overdoses. The baby also had a heart virus that may have contributed, Stier said.

306.    Stier was certain that the infant had no skull fracture, yet the pressure exerted on

him by Knox and her other proponents of the SBS/AHT enterprise caused him to falsely testify otherwise – consistent with the Helfer Playbook engineered in part by Knox, Esernio-Jenssen and Harper.

307. Knox also attempted to cause a false child abuse prosecution of Greg Shebesta, the father of Henry, an infant.

308. There was no medical basis for Knox's false accusation of child abuse. She made the false accusation because Henry presented to the hospital with a brain bleed, but no other evidence of abuse.

309. Knox knew that Henry suffered from a blood clotting disorder that was known to cause brain bleeds like the one with which Henry was admitted.

310. Despite this fact, Knox attempted to promote the SBS/AHT enterprise through this false accusation.

311. Knox also attempted to cause a false child abuse prosecution of the Siebold family.

312. Leo Siebold was born with several medical conditions that required close monitoring, including heterotaxy syndrome, in which the internal organs are abnormally arranged. Leo's parents were told to bring Leo to the hospital if he developed a fever over 100 degrees.

313. Leo's mother, Brenna – a third grade teacher – followed that advice and brought Leo to a Wisconsin hospital when his fever spiked.

314. In the process of attempting to place an IV and a catheter, Leo thrashed, causing him to suffer bruises and cuts. Leo also had older scars from previous medical treatments at the hospital.

315. The following day Knox, who was again attempting to "find" victims of abuse to

55

support the SBS/AHT enterprise and her own financial and reputational wellbeing, falsely accused Brenna and her husband of abusing Leo.

316. In the process of doing so, Knox falsely represented herself as a "blood specialist" to Leo's parents, arousing suspicion in Breanna, who had talked to Leo's actual hematologist at the hospital earlier that day.

317. Knox overcame Brenna's reservations and was allowed to take additional, unnecessary blood tests from Leo.

318. Leo's parents were interviewed by the police, who instantly dismissed the allegations, concluding that Leo's bruises and other physical injuries were caused by medical staff when they attempted to place the IV and catheter.

319. Brenna told reporters afterwards that she was haunted by her family's run-in with Knox's team and wondered how less-educated parents, parents in poverty, parents who did not speak English, and parents without such strong community ties and family support could weather such accusations.

320. Knox also attempted to cause a false child abuse prosecution of Alfonzo Clayborne in support of the SBS/AHT enterprise.

321. On June 8, 2016, Alfonzo Clayborne found his 3-month-old son unresponsive in his crib. He called the baby's mother. She came home from work, and together they called 9-1-1. An ambulance took her and the baby to the hospital. Clayborne followed in his car. But once he arrived, the staff barred him from joining his family.

322. The hospital's child abuse team told authorities the baby had brain bleeding and a left leg fracture. A physician assistant told police other injuries were possible but not yet confirmed, according to the criminal complaint.

56

323.    Then-medical director Knox had examined and diagnosed the baby. Her physician assistant, Amanda Palm, relayed Knox's diagnosis to police and told them the child's injuries were caused by intentionally inflicted trauma.

324.    Authorities thereafter focused on Clayborne. A police officer and child protective services worker interviewed him. The child protective services worker was the first to tell him news of his son's condition.

325.    A pediatric orthopedist later determined Clayborne's son never had a fracture, but "a normal variant of the distal femur," according to a court document.

326.    The baby left the hospital with a cast on his leg for a break that he never had.

327.    Clayborne was charged with first-degree reckless injury. These chargers were later dropped after independent experts reached radically different conclusions than Knox.

328.    Knox also attempted to cause a false child abuse prosecution of a Lake Mills childcare provider who fell down the stairs while holding a 4-month-old.

329.    The baby sustained a blow to the head, which briefly knocked him unconscious, while the caregiver suffered minor injuries. After scans showed the child had bleeding on his brain and hemorrhaging in his eyes, Knox declared it abusive head trauma, and the woman was charged with recklessly causing the baby harm.

330.    The court dismissed the charges during trial, finding Knox's theory unsustainable.

331.    In addition to engaging in the fraudulent and unprofessional conduct described above, and in order to further facilitate her participation in the SBS/AHT enterprise, Knox provided false and fraudulent testimony in criminal prosecutions in order to assist in obtaining wrongful convictions against parents and caregivers accused of SBS/AHT.

332.    Knox's participation in and furtherance of the SBS/AHT enterprise resulted in

considerable fees for expert testimony as well as the maintenance of her national reputation and position with UW.

333. By 2019, the UW discovered that Knox had engaged in fraudulent and unprofessional conduct in furtherance of the SBS/AHT enterprise.

334. UW placed Knox on administrative leave on July 5, 2019, finding that Knox had engaged in "unprofessional acts that may constitute retaliation against and/or intimidation of internal and external colleagues."

335. Knox resigned in response to the investigation.

336. Meanwhile, a group of Wisconsin investigative journalists determined that Knox had misdiagnosed child abuse in twelve different prosecutions and child welfare cases.

337. Knox thereafter moved to Alaska and took on the role as the Medical Director at the child advocacy center, Alaska CARES, in November, 2019.

338. During Knox's first year at Alaska CARES, abusive head trauma / physical abuse cases increased by 173 – 220%

339. While in Alaska, Knox implemented the same Helfer Society-derived SBS/AHT Playbook she had used in Wisconsin, which included bullying, extortion and retaliation against colleagues in order to manufacture child abuse diagnoses as well as misdiagnosing child abuse herself.

340. As a result of Knox's abusive and fraudulent conduct, most of the workers and professionals in the Alaska CARES child abuse program resigned their positions.

341. Knox was placed on leave in November of 2021 during an investigation of workplace toxicity and allegations against Knox's medical judgement.

342. Knox was forced to find a new position at the University of Florida, a position she

obtained through the recommendation of Helfer Society members Lynn Sheets, MD and Esernio-Jenssen.

343.   Knox became a Clinical Professor at UF Jacksonville, assigned to the Child abuse and Pediatric Forensics division, where she teamed up with Randall Alexander, MD ("Alexander").

344.   Alexander and Tom Fallon, former Dane County Assistant DA and lead prosecutor in *State of Wisconsin vs Jennifer Hancock*, presented together at the National Center on Shaken Baby Syndrome's 16th annual conference in Orlando, Florida in 2018.

345.   Alexander and Harper co-authored Medical Response to Child Sexual Abuse in 2019.

346.   In over 18 years of work as a child abuse physician, Knox has been directly involved in at least 12 cases of diagnosed abusive head trauma that were either dismissed by prosecution, dismissed by judges, adjudicated and defendants found not guilty, or defendants were convicted under dubious circumstances and the cases are now under appeal.

**Facts Regarding Plaintiff**

347.   Sharon was on staff at the U of M medical school and was a UMP physician practicing at Fairview for approximately 17 years.

348.   Sharon also served as the Medical Director of the U of M's Pediatric COVID clinic.

349.   In early January, 2022, Sharon was the primary provider caring for Baby H, who had been admitted to Fairview with feeding difficulties.

350.   Earlier on the day of admission, Baby H underwent an endoscopic exam and a head MRI as an out-patient at the Masonic Children's Hospital at Fairview.

351. The endoscopic exam was done as part of an extensive out-patient work-up for feeding difficulties.

352. Baby H's head circumference at birth was below the 30th percentile, however at age 3 months, his head circumference had grown to over 90th percentile.

353. This unexplained enlargement in head circumference was what prompted the head MRI scan.

354. The scan revealed pockets of a few weeks' old mixtures of blood and proteinaceous fluid on both sides of the brain surface.

355. These findings were communicated by phone to the out-patient gastroenterologist, who ordered the study.

356. The ordering gastroenterologist then communicated the results by phone to Dr. Caroline George, "George," the CAP provider on call that day.

357. George advised the ordering gastroenterologist that the child must be referred to the Fairview emergency room as soon as possible for further evaluation of suspected child abuse related to the head MRI findings.

358. Baby H had no bruising, soft tissue injuries or any medical indicia of abuse.

359. George and the gastroenterologist agreed that due to the presence of feeding difficulties and the lack of overt trauma, Baby H should be admitted to the hospitalist service.

360. Baby H was seen at the Fairview emergency room on the evening of January 10th, 2025, and was referred to the hospitalist service and admitted to the 6th floor at Fairview.

361. Sharon first saw and examined Baby H during morning rounds on January 11th, 2025.

362. As part of his usual habit, routine, practice and training as a physician, and

consistent with the required standard of care, Sharon conducted his initial full evaluation of Baby H.

363. Sharon reviewed the case, discussed it with the house staff and bedside nurses, obtained a detailed history from the mother, and performed a physical examination.

364. Sharon's assessment was that of an infant with a systemic illness, likely immune-mediated, causing enteritis and failure to thrive.

365. Sharon noted no clinical signs of acute trauma. As Sharon developed a management plan, he communicated with the care team to coordinate Baby H's ongoing care.

366. Sharon and Baby H's assigned neurologist, UMP and U of M physician Matthias Zinn, MD, both medically concluded and opined that the fluid collection was likely spontaneous and not the result of abuse.

367. Dr. Zinn concluded, that as a result, "from a neurologic perspective, the most likely etiology [of the fluid collection] is spontaneous bleeding."

368. As part of his usual habit, routine, practice and training as a physician, and consistent with the required standard of care, Sharon documented these opinions and differential diagnoses in Baby H's electronic health record, "EHR."

369. As part of his usual habit, routine, practice and training as a physician, and consistent with the required standard of care as Baby H's attending physician, Sharon met with Baby H's parents and informed them of these differential diagnoses and medical opinions.

370. It was subsequently concluded that a transient vitamin K deficiency, occurring during a period of significant gastrointestinal symptoms and worsening feeding difficulties around two months of age—but no longer present at the time of hospital presentation—likely increased Baby H's susceptibility to bleeding.

371.    While a transient vitamin K deficiency as the cause of spontaneous bleeding cannot be definitively confirmed, as available testing and clinical examination are not sufficiently sensitive to reliably rule in or rule out this possibility, the child's clinical presentation and subsequent course made it the most plausible explanation for the abnormal MRI findings.

372.    At the time, Sharon was not aware of UMP/Fairview/U of M and Harper's secret and concealed policies, procedures, practices and customs regarding child abuse documentation outlined above.

373.    In particular, Sharon was not aware that in order to ensure and maximize successful child abuse prosecutions –and thus preserve funding for their child abuse program -- Harper and the co-defendants had put into place policies, procedures and customs that forbade UMP/Fairview/U of M clinicians from expressing or documenting medical opinions that conflicted with Harper and/or her child abuse team's determination that a baby was the victim of child abuse.

374.    Sharon was also unaware of UMP/Fairview/U of M's policies, procedures, practices  and customs that automatically reassigned a baby with certain injuries (brain bleeds and fluid on the brain, for example) from the hospital's hospitalist service to the hospital's trauma service so as to ensure that the baby was seen by CAPs and not clinicians or hospitalists such as Sharon and/or Zinn, who would be more likely to express or document a diagnosis that conflicted with a child abuse finding.

375.    These policies, procedures, practices and customs were specifically created and implemented to prevent the development and documentation of potentially exculpatory medical evidence, making it easier for law enforcement and the HCAO to prosecute accused child abusers.

376.     Because Fairview and UMP policies automatically notified Harper's CAP team

when intracranial fluid was identified, the finding on Baby H's MRI triggered an immediate referral to Child Abuse Pediatrics. George, was promptly assigned to the case assumed control over the evaluation and aspects of Baby H's care.

377.    George submitted a report to Child Protection Services (CPS).

378.    In that report and as a direct result of the policies, procedures, practices  and customs implemented by Harper and carried out by the co-defendants at UMP/Fairview/U of M, George immediately and without medical basis diagnosed Baby H with SBS/AHT based on the old brain fluid collection -- even though there was no credible medical or factual basis for the diagnosis of SBS/AHT, a diagnosis that made no medical or practical sense in light of Baby H's overall presentation and history.

379.    George knew and intended that by diagnosing Baby H as a victim of abuse, Baby H would be separated from his parents, who would likely be investigated and/or prosecuted for child abuse based on George's diagnosis alone and that her false and unsupported SBS/AHT diagnosis immediately implicated Baby H's parents as the abusers.

380.    As a result of this false and medically unsupported diagnosis child protection workers recommended taking Baby H from his parents.

381.    Because Sharon was Baby H's attending physician and because he knew that it was highly unlikely that Baby H's condition was caused by abuse, he intervened on his patient's behalf, which was his ethical duty as well as his duty as a physician, teacher and employee of UMP and the U of M.

382.    As part of his duties, Sharon met with CPS and law enforcement (LE) to discuss Baby H's presentation prior to any major decision being made.

383.    When Sharon met with CPS and LE he discussed several potential diagnoses,

63

including—but not limited to—SBS/AHT.

384. Sharon explained that the infant's MRI findings were not consistent with a recent traumatic event and that the clinical picture aligned more closely with a non-abusive medical process already under evaluation.

385. During these discussions, Sharon emphasized that the immediate removal of Baby H and his two-year-old brother from their parents would almost certainly result in emotional, psychological, and potentially physical harm to the children.

386. Sharon expressed his medical opinion that such removal appeared premature and excessive given the available clinical information and the absence of any physical indicia of abuse.

387. Sharon proposed safe, less harmful alternatives designed to protect the children while minimizing unnecessary trauma. These alternatives included: a) Placement with a relative or trusted family friend rather than immediate foster care; or b) Continued hospitalization under protective supervision, allowing the parents to remain with the children while CPS and law enforcement completed their assessment.

388. Following further discussion among CPS, law enforcement, and the care team, the parties agreed that continued hospitalization under protective supervision was the safest and least disruptive option.

389. The charge nurse confirmed that unit staff could support such a plan.

390. Pursuant to these discussions, both children were placed on a 72-hour protective hold under CPS custody, ordered by the responding law-enforcement detective.

391. This arrangement allowed the children to remain in the hospital with their parents under continuous supervision until an appropriate relative or family friend could be identified or

until a court hearing could be held.

392. On the day the hold period was scheduled to expire, Sharon made multiple attempts to reach Melvina Harel, Baby H's CPS case worker.

393. Ms. Harrell did not return Sharon's phone calls.

394. Instead, upon information and belief, Ms. Harrell contacted Harper or her office to complain about Sharon's interference with the child abuse prosecution of Baby H's parents and to prevent Sharon from continuing to provide the parents with medical information and/or opinions they could use to defend themselves in the child abuse prosecution.

395. Harper in turn contacted UMP/Fairview's Chief Medical Officer, Defendant Dr. Sameer Gupta.

396. Upon information and belief, Harper instructed and/or pressured Gupta to order remove Baby H's removal from Sharon's care; to retaliatorily and coercively threaten and discipline Sharon for documenting opinions in the medical record that conflicted with the SBS/AHT diagnosis; and to retaliatorily and coercively threaten and discipline Sharon for telling Baby H's parents that Baby H's fluid collection was from something other than intentional abuse.

397. Gupta instructed Defendant Jordan Marmet, MD, Fairview Hospitalist Division Director and a manager of UMP to carry out Harper's instructions in order to silence Sharon and to prevent him from publicly exposing UMP, Fairview and U of M's wrongful child abuse polices, procedures, practices and customs.

398. On January 18, 2022, the day the hold order was set to expire, Marmet, acting on directives from Gupta and Harper informed Sharon that he was being immediately removed from Baby H's care team and was prohibited from any further contact with the family.

399. This removal occurred over the explicit objections of Baby H's parents, who

identified Sharon as their son's primary physician and wished him to remain involved.

400. The decision effectively terminated the doctor–patient relationship mid-hospitalization, without explanation, investigation, or any form of due process.

401. Marmet stated that Fairview/UMP leadership had directed the removal in response to concerns raised by Harper, who complained that Sharon's documentation and communications with CPS and law enforcement had created liability for the hospital.

402. When Sharon asked what specific conduct or documentation had triggered these concerns, Marmet acknowledged that he was unsure and instructed Sharon to contact Gupta for clarification.

403. Consistent with his usual practice, Sharon attempted to explain his clinical reasoning, summarize Baby H's course of care for the preceding week, ensure continuity of care and ensure safety for Baby H and his family unit.

404. Marmet was not receptive and made clear that the decision had already been finalized by leadership.

405. Sharon then contacted Gupta, who confirmed that Sharon's removal from the care team had been made at Harper's request.

406. Harper was not in Sharon's direct or indirect line of supervision or authority.

407. Because of Harper's financial and political importance to the University, UMP and Fairview, In response to Harper's political pressure, Gupta, Marmet, Neglia and Fairview/UMP/U of M leadership decided that the University, UMP, U of M and Fairview's interests would be best served by appeasing Harper even though that also meant that Baby H's parents would be denied exculpatory medical evidence that they could use to defend themselves against the wrongful child abuse prosecution and even though Baby H would not receive the

clinical workup he needed to address the problems for which his parents brought him to the hospital.

408.    Gupta, Neglia, Marmet and Fairview/UMP/U of M leadership agreed the best way to support Harper and her CAP team in this case was by denying Baby H's family access to exculpatory medical evidence so that Harper and George would receive no interference or pushback in regard to their medically unsupported child abuse diagnosis and allow the hospital to continue managing Baby H as a piece of prosecution evidence, as opposed to a pediatric clinical patient and so the parents could be prosecuted without conflicting medical evidence generated at Fairview.

409.    As a result of these decisions, when Sharon requested an opportunity to explain his clinical judgment and raise concerns regarding patient safety and continuity of care, Gupta declined to engage substantively.

410.    Gupta reiterated that the decision reflected Harper's position, had the full support of Fairview/UMP leadership, and that any further discussion would take place only at Harper's discretion and only in her presence.

411.    In order to carry out Harper's plan, scheme and directives, Baby H was reassigned to the care of a different hospitalist cooperative with Harper and that Marmet verified would not interfere with Harper and George's control, ensuring that Baby H's forensic workup would receive no further interference.

412.    Meanwhile, George contacted law enforcement and child protection workers and falsely and fraudulently told them that Sharon and Zinn did not hold medical opinions that conflicted with George and Harper, thereby deceiving them into believing that Sharon and Zinn were in agreement that Baby H's brain fluid was likely caused by child abuse.

413. In order to further ensure that Sharon kept quiet about Baby H's case and Harper's secret policies and procedures that were revealed to him during his involvement with Baby H, On January 20, Gupta emailed Sharon and informed him that he would be required to attend a Zoom meeting on January 21, 2022.

414. When asked about the subject of the meeting and whether Zinn would be attending, Gupta replied that the meeting would focus on Fairview and UMP's child abuse protocols.

415. Gupta informed Sharon that he would not be permitted to invite any other attendees.

416. On that same day, George's opinion that Baby H was a victim of SBS/AHT caused the HCAO to seek an expedited proceeding to remove Baby H and his brother from their parents.

417. Hennepin County child protection workers also removed Baby H's two-year-old brother from his home based on George's false SBS/AHT diagnosis of Baby H.

418. Baby H and his two-year-old brother were both separated from their parents and temporarily held at Fairview under guard.

419. The children were both thereafter placed in unfamiliar foster environments.

420. Both babies contracted COVID in their foster environments.

421. Baby H's brother suffered from profound emotional distress as a result of the forced removal from his home and continues to have nightmares to this day.

422. On January 21, 2022, Sharon attended the Zoom hearing as required by CMO Gupta.

423. Other attendees included Harper, Marmet, Gupta, Neglia and Angela Nelson,

68

UMP's corporate attorney.

424. Attorney Nelson led the Zoom meeting.

425. Nelson asked Sharon whether he had legal counsel, confirming that the meeting was adversarial, disciplinary, threatening and in retaliation for Sharon's violation of Defendants' policies, procedures, protocols and customs.

426. The Zoom meeting was not patient advocacy -- and not related to quality assurance because there was no question over the fact that Sharon's diagnosis of Baby H's condition was medically correct.

427. Since Nelson announced that the proceeding was adversarial, and that Sharon may need his own attorney, she did not act as Sharon's attorney, nor did she provide him with any legal advice.

428. Gupta confirmed that the meeting was not for the purpose of quality assurance by instructing Sharon that Baby H's clinical care would not be discussed.

429. Sharon was informed by the other Zoom participants, including Nelson and Gupta that he had violated several as yet undisclosed (to Sharon) UMP/Fairview/U of M policies and procedures -- particularly the policy and procedure that prohibited him from documenting his clinical opinions about the causes of Baby H's brain fluid in Baby H's medical record, unless his opinions matched those of George, Harper and/or the child abuse team.

430. Sharon was also instructed that once the child abuse team was involved, the policy normally required the baby to be transferred out of the hospitalist service and into the surgery/trauma service and assigned exclusively to the child abuse team so that hospitalist specialties would no longer be involved in the baby's care.

431. Sharon was informed that the purpose of these secret and concealed policies was

to ensure that there was a cohesive approach to the diagnosis of child abuse so that law enforcement and prosecutors will not be "confused" by the possibility the child's injuries may have been accidental or caused by a medical condition other than the abuse diagnosed by Harper's child abuse team.

432. In other words, Sharon was told that UMP/Fairview/U of M's official policy required its physicians to refrain from collaborating in the care of patients that had been reassigned to the child abuse physician's service; that its physicians were prohibited from documenting differential diagnoses or diagnoses that conflicted with the child abuse physician's service; and that its physicians were forbidden from utilizing their training or scientific methods in child abuse cases.

433. Sharon found the meeting shocking and troubling for a number of reasons, including:

     a. The fact that his employers' previously concealed policy, stated through its attorney and its CMO, was to ensure that any child marked with a diagnosis of suspected child abuse by Harper's team would stop receiving competent medical assessment and treatment by Fairview and UMP's specially trained pediatric hospitalist staff and would instead become a forensic patient of Harper's child abuse team, with little or no access to care provided by specialty physicians with an ability to diagnose or treat a condition other than child abuse; and

     b. The fact that his employers' previously concealed policy, stated through its attorney and its CMO, was to ignore, omit and/or conceal important and potentially exculpatory medical opinions and findings so that child

abuse suspects could be more easily and efficiently prosecuted civilly and criminally.

434. Sharon recognized his employers' stated policies as being fraudulent, unethical, immoral, unscientific and destructive to children and families, contrary to medical ethics and dangerous to patients systemwide.

435. Sharon made his views and concerns known to the Zoom meeting attendees.

436. As a result of his grave concerns, Sharon followed up with a letter of complaint dated January 24, 2022. The letter identified the medical, ethical, moral and scientific concerns identified above. Sharon handed his complaint letter directly to Neglia.

437. Sharon received no response to his concerns.

438. Instead, Sharon's complaints prompted Defendants to escalate their campaign to silence Sharon and prevent him from interfering with Defendants' wrongful and unconstitutional policies, procedures, practices and customs.

439. On February 2, after being contacted by the attorney for Baby H's parents the previous week, Sharon provided the parents' attorney with a summary of his truthful opinions based on his assessment of Baby H.

440. Sharon's continued complaints about Defendants' wrongful and unconstitutional policies, procedures, protocols and customs combined with his communications with Baby H's parents' attorney prompted Defendants to escalate their campaign to silence Sharon so that Defendants' illegal money-generating scheme could continue unabated.

441. As part of Defendants' campaign to silence Sharon through intimidation and veiled threats, Gupta summoned Sharon to attend another Zoom meeting on February 15, 2022.

442. Because Sharon understood that this Zoom meeting would be another retaliatory,

coercive, threatening, unlawful and adversarial disciplinary conference and not a quality assurance meeting, Sharon recorded the Zoom conference on his phone.

443. The other participants on the Zoom conference included Nelson, Harper, Marmet, Gupta, Neglia and George.

444. The purpose of the Zoom meeting was not quality assurance but was rather for the purpose of silencing Sharon through threats and intimidation and to prevent him from continuing to express his complaints about Defendants' policies that favored manipulation of medical evidence used in child abuse prosecutions and warning him that continuing to express medical opinions or complaints that conflicted with those of George, Harper and the CAP team was a violation of UMP, U of M and Fairview policy.

445. Among other things, Sharon was informed by UMP/U of M/Fairview/Fairview clinical executives and legal counsel:

   a. That Sharon's scientifically and medically supported chart note and discussions with law enforcement had caused "confusion" and "moral distress" on the part of law enforcement that George was forced to "correct," e.g., that law enforcement was upset about being asked to seek prosecution of parents that apparently had not injured their baby and George was forced to defraud law enforcement into falsely believing that there were no opposing medical views regarding the abuse findings;

   b. That Sharon's act of sharing his truthful and scientifically based medical opinions with Baby H's parents – who had a legal right to this information -- had caused them to become "confused" over whether they had abused their baby–which was ridiculous in light of the fact that the parents already knew that they had not

abused their baby; .

c.    That UMP, U of M, and Fairview's policy was to admit babies with suspected abuse to the surgery/trauma service instead of the hospitalist service so that they would only be seen by the child abuse pediatricians. Gupta commented that the policy was to avoid continuing to clinically treat babies on the hospitalist unit because that resulted in the baby receiving assessments from different specialties that could raise the likelihood of medical diagnoses that conflicted with those reached by the child abuse team, which is something that UMP and the hospital had a policy of avoiding, even though that policy sacrificed clinical care in favor of forensic evidence gathering;

d.    That if abuse was suspected, providing clinical care for the baby's presenting problem would interfere with the child abuse team's mission.  If clinical care was necessary, the child abuse team would only seek involvement from what were apparently hand-picked "general pediatricians" instead of clinical specialists so as to avoid obtaining clinical workups that conflicted with the child abuse diagnosis.

e.    That the UMP/U of M/Fairview policy was for the child abuse pediatricians – who were forensic doctors that did not provide clinical care – to "work backward" from the child abuse diagnosis to attempt to treat the baby's actual medical problem if that was required, instead of using generally accepted methods of clinical diagnosis;

f.    That all of the baby's diagnoses in the medical record have to "line up" with the primary child abuse diagnosis so as to avoid making the case difficult for law enforcement and the prosecutors;

g.   That persons who are not medical providers (e.g., jurors) will not understand why there are differing opinions in the medical record;

h.   That there has to be only one story, (e.g., one diagnosis) in the medical record in order to avoid legal issues, e.g., lawsuits by parents falsely accused of abusing their babies; and

i.   That the child abuse pediatrician, e.g. Harper, "drives the ship" as to diagnostic and clinical care, to the exclusion of all other physicians.

446.   Upon information and belief, at or around the time of these Zoom meetings, Harper and/or Gupta directed others at Fairview, including Laura Crowley, Fairview's Medical Staff Compliance Officer, to find "dirt," e.g., fabricated or embellished concerns about Sharon that UMP, Fairview and the U of M could use to threaten and/or extort escalate threats and extortion intended to force Sharon into complying with the above directives prohibiting Sharon from interfering in child abuse determinations or prosecutions initiated by Harper's team.

447.   As part of this escalation in the campaign to silence Sharon, On February 21, 2022, Gupta and Crowley sent Sharon a letter on Fairview letterhead on February 21, 2022, in which they suggested that Crowley's office had received unspecified and voluntary "reports" concerning Sharon's conduct or professionalism.

448.   The letter stated that these concerns had been reviewed by UMMC's Leadership Council on February 18, 2022 and that the Council concluded that "there is a trend of disregard for standard processes, procedures and guidelines, as well as for the clinical expertise of colleagues."

449.   There were no legitimate, arm's length concerns about Sharon that were brought to Crowley's attention.

450. Rather, Gupta and Crowley's letter was a veiled threat:

    a.    designed to stop Sharon from exercising his right to free speech;

    b.    designed to prevent Sharon from continuing to help Baby H's parents avoid the false prosecution commenced by George and Harper; and

    c.    designed to make Sharon fall in line with Fairview/UMP/U of M policies put in place by Harper.

451. On March 2, 2022, Defendants continued their campaign to silence and intimidate Sharon by summoning him to a meeting with Neglia and Marmet.

452. During that meeting, Neglia and Marmet threatened Sharon that he would suffer employment and professional repercussions if he continued to assist Baby H's parents by providing them with medical opinions or by acting as a witness on their behalf; if he continued to help to communicate his opinions to Baby H's defense attorney, as a witness, medical provider, or otherwise; and if he continued speaking out against Fairview, UMP and U of M's child abuse policies and procedures.

453. Neglia and Marmet told Sharon that in the event he (unwisely) chose to cooperate with the attorney for Baby H's parents, Sharon would be required to forward all such communications with UMP's attorneys.

454. Upon information and belief, the purpose of this last directive was to monitor Sharon's communications to ensure that Baby H's family attorney was not provided with details about Defendants' secret child abuse policies and procedures, which that attorney could use to exculpate his clients.

455. UMP's attorneys would also share this information with the HCAO in order to assist it in the civil and criminal proceedings.

456. Upon information and belief, around this same time, Harper and/or Gupta directed others to gather up phony, marginal, fabricated or embellished clinical concerns that UMP, Fairview and the U of M could use to threaten and/or extort Sharon into complying with the above directives prohibiting Sharon from interfering in child abuse determinations or prosecutions initiated by Harper's team.

457. On March 10, 2022, responding to Sharon's request to better understand the complaints against him, Gupta and Fairview's Medical Staff Compliance Officer, Laura Crowley met with Sharon.

458. During the course of that meeting, Gupta and Crowley presented Sharon with fabricated or embellished "dirt" that was gathered up in order to make Sharon refrain from speaking out about the wrongful and unethical child abuse policies and to force him to threaten and extort Sharon into complying with UMP, Fairview and the U of M's unethical and wrongful demands of compliance and silence him.

459. Three of the fabricated or embellished concerns raised by Gupta and Crowley involved Sharon's alleged interactions with the pharmacy regarding COVID treatment protocols.

460. The fourth concern discussed during that meeting was Sharon's continued attempts to help Baby H's parents defend the child abuse prosecution brought about by George and Harper by and through "non-standard processes and inconsistent communication regarding placement of a child abuse case."

461. Gupta made it clear that if Sharon continued speaking out against the policies and helping parents or caregivers accused of child abuse by Harper's team, Gupta, Fairview, UMP and the U of M would continue find and to manufacture and bring additional complaints against Sharon, thereby threatening his employment with UMP and the U of M.

462.    During the March 10, 2022 meeting, Sharon, again, attempted to bring up his concerns about the CAP policies and procedures regarding SBS/AHT and again, Gupta refused to discuss this forward and referred Sharon to Harper for such concerns.

463.    Gupta followed up the March 10 meeting with a March 25, 2022 letter to Sharon written on Fairview letterhead in which Gupta recounted the earlier meeting.

464.    Since Sharon's important public, medical and ethical concerns were repeatedly ignored by his direct supervisors (Marmet, Gupta, Neglia), Sharon wrote a letter addressed to Gupta and the hospital leadership council, describing his experience and concerns regarding management of infants with subdural fluid collections and the often premature and definitive assumption of SBS/AHT.

465.    In that letter, dated March 17, 2022, Sharon described his experiences and wrote:

- That premature family separation in Baby H's case caused significant, unnecessary, and preventable harm, and occurred before CPS conducted a meaningful investigation or evaluated alternative safety plans.

- That while abusive head trauma must be considered and reported, clinicians also have a duty to consider non-abusive medical explanations, particularly when no corroborating clinical signs, social risk factors, or additional evidence of trauma are present. A duty that the hospital management not only not encourages, but retaliates against.

- That CPS relied exclusively on the opinion of a single consultant while disregarding the treating team's assessment, resulting in a rushed out-of-home placement that contradicted the WHO's directive to use the least intrusive, least harmful intervention consistent with child safety.

77

- That the prevailing SBS/AHT paradigm at Fairview/UMP marginalized dissenting medical opinions, pressured clinicians to "fall in line," and created a dangerous overreach whereby child-abuse consultants dictated care even in cases lacking evidence of trauma.

- That this institutional culture undermined patient safety, contributed to wrongful family separation, and caused significant moral and emotional distress to the providers involved, prompting his call for institutional review and corrective action.

466.    On May 5, 2022 Sharon received an email from Crowley stating that the concerns Sharon raised in his letter had been reviewed by the Committee for Professional Enhancement (CPE). However, no conclusion for that review was identified.

467.    When Sharon asked for further clarification that his concerns were actually addressed and changes will be made to the policies, procedures, and practices that put children and families at risk, he did not receive any meaningful answer.

468.    Crowley wrote to Sharon in an email dated May 20, 2022, that due to Minnesota peer review protection, the conclusion of the discussion could not be disclosed. Sharon did not receive any further communication acknowledging his concerns.

469.    Defendants' threats and acts of intimidation and manufactured probation forced Sharon to stop making complaints about Defendants' wrongful policies and conduct for a period of time.

470.    However, in May, 2023, Sharon was again confronted with the senseless family destruction caused by Defendants' wrongful policies and conduct, over which he could no longer remain silent.

471.    At that time, Sharon was assigned to attend to the care of Baby C.

472.    Baby C's mother, a pediatric nurse, had enrolled Baby C in a study conducted by the U of M.  As part of that study, Baby C underwent a head MRI.

473.    The MRI was reviewed two days later by a pediatric neuroradiologist, who noticed the presence of a small, older brain bleed and conveyed the findings to the research coordinator.

474.    As a result of the above policies, procedures and customs created by Harper and instituted by the institutional Defendants, rather than contacting a medical provider for clinical evaluation, the coordinator instead notified Hennepin County Child Protection Services, and a CPS caseworker immediately initiated an investigation.

475.    Before Baby C received any medical assessment or examination, the caseworker conducted an unannounced home visit, questioning the family regarding possible abuse.

476.    At the conclusion of the home interview, CPS worker compelled Baby C's mother, under threat of legal consequences, to bring Baby C to the Fairview emergency department for diagnosis and testing.

477.    As a result of the above policies, procedures and customs created by Harper and instituted by the institutional Defendants, Baby C's brain bleed was also reported to the child abuse team who alerted the Trauma service of the pending admission.

478.    At Fairview, Baby C was evaluated by multiple providers, including the ED attending, the Trauma Service attending, and George, the on-call CAP provider.

479.    The trauma attending requested a consultation from a general pediatrician.

480.    Sharon was the pediatric hospitalist on call, and saw Baby C at the ED after accepting the consultation request from the trauma attending.

481.    As part of his usual habit, routine, practice and training as a physician, and consistent with the standard of care, Sharon examined Baby C, reviewed the timeline of events leading to his presentation, and assessed the MRI findings.

482.    Sharon observed no bruising, no soft-tissue injuries, no neurological symptoms, no social concerns, and no other indicia of abuse.

483.    Sharon's documented differential diagnosis appropriately included SBS/AHT, and also recommended the standard SBS/AHT evaluation.

484.    Considering all differential diagnoses, Sharon's medical assessment was that Baby C was a healthy, thriving infant and that the small fluid collection was clinically insignificant and most likely attributable to Benign Enlargement of the Subarachnoid Spaces ("BESS"), given his head-size history and the absence of any traumatic findings.

485.    As part of his usual habit, routine, practice and training as a physician, and consistent with the standard of care, Sharon discussed his evaluation and reasoning with Baby C's parents.

486.    Sharon entered a truthful, accurate and medically- supported note in Baby C's medical record describing his findings and medical opinion, stating that Baby C's brain bleed was not likely the result of abuse.

487.    Drawing upon his clinical experience—including prior encounters with CAP's handling of isolated subdural fluid collections—Sharon included the following evidence-based opinion in his note: *"One should practice extreme caution in attributing an isolated intracranial fluid collection to abusive head trauma when no additional clinical signs or symptoms are present, as the evidence supporting such a conclusion is controversial and has been questioned by many authorities."*

488. Baby C was flagged for abuse by his presentation, and despite absence of any signs of trauma and as a result of the above policies, procedures and customs created by Harper and instituted by the institutional Defendants, Baby C was admitted to the trauma service.

489. Baby C was discharged the following day (June 1, 2023).

490. Sharon continued to follow his progress both during hospitalization and after discharge. This was necessary because Baby C's parents had been led to falsely believe that the CAP team was responsible for his general pediatric management and follow-up care.

491. In reality, George and the CAP team were engaged solely to gather information for the abuse investigation, not to provide medical continuity or pediatric care.

492. Because neither the Trauma Service nor the CAP team arranged outpatient follow-up, Sharon appropriately assumed responsibility for ensuring monitoring, coordination, and continuity of care through his outpatient clinic.

493. As was the case with Baby H, Baby C was not provided with care or treatment for his brain bleed. Instead, members of Harper's team ordered expensive medical tests that they intended to use to prove a case of child abuse against Baby C's parents even though there was no reasonable medical basis for ordering those tests.

494. When Harper saw Sharon's documentation that had effectively prevented her team from pursuing child abuse charges against Baby C's pediatric nurse mother, Harper reported Sharon to Defendants' institutional leadership team.

495. Two days after Sharon saw Baby C and documented his opinion in the EMR, on June 2, 2023, Marmet paged Sharon, instructing Sharon to call him immediately.

496. Over the phone, Marmet informed Sharon that Harper had seen Sharon's note, and was "furious."

497.    Marmet added that he, and the rest of the hospital leadership, considered Sharon's documentation as a repeated deviation from Harper, UMP, Fairview and the U of M's policies, practices, protocols and customs.

498.    Sharon responded that his note accurately reflected the clinical facts, that his recommendations were consistent with hospital protocol, and that cautioning against premature conclusions regarding SBS/AHT was well within his professional role as a pediatric hospitalist—particularly in cases lacking clinical evidence of trauma.

499.    Sharon then asked whether there were concerns related to his clinical care or was it limited to his documentation only. Marmet clarified that the concerns are specifically to the documentation.

500.    Marmet acknowledged Sharon's duty was to provide parents with an honest medical assessment but reiterated that for children in whom abuse is suspected, different opinions should not be documented in the medical record because they could increase institutional liability. Marmet instructed Sharon not to document such opinions in the medical chart.

501.    Sharon expressed to Marmet that instructing him to omit clinically relevant information and document his reasoning would be unethical and contrary to the standard of care.

502.    According to Marmet, Harper asserted that the opinion expressed in Sharon's note was outside of Sharon's scope of practice and could expose the hospital to legal liability.

503.    When Sharon asked what "legal liability" or statutory violation was being alleged, Marmet could not provide an answer.

504.    Sharon warned that restricting medical documentation for institutional protection—as he had previously witnessed in Baby H's case—posed grave risks to patient safety, including the risk of false accusations, unnecessary family separation, and serious harm to

children and families.

505.  Marmet acknowledged these dangers, but ended the call repeating that all clinical issues relating to child abuse are managed by Harper, who is objecting to Sharon documenting his opinions.

506.  Following that conversation and no longer able to remain silent about what he saw as pervasive and destructive policies at his University and medical institution,  Sharon wrote another letter of complaint to UMP, Fairview and U of M's leadership council, in which he reiterated his previous and unaddressed concerns about the institutional child abuse policies, procedures and customs put in place by Harper.

507.  Among other things, Sharon wrote:

- The conduct of CPS in both cases [Baby H and Baby C] has been unprofessional. It appears that their approach to any case of intracranial fluid collection lacks context and tends to be overzealous.

- The science surrounding shaken baby syndrome/abusive head trauma (SBS/AHT) is much more controversial than I previously realized. Unfortunately, not only is there controversy, but any voice or opinion that questions some of the evidence behind our practices is met with immediate and harsh criticism, as well as pressure from authorities to avoid making such suggestions.

- The current paradigm, where child abuse specialists take the lead in the clinical care of these children, even when no other signs or symptoms of trauma are present, represents a dangerous overreach. Children and their families deserve quality medical care in all situations, but under our current processes and procedures, some are unfortunately denied that.

- Over the past year and a half, since my initial involvement with the first case, I have had numerous conversations with many providers in our department and hospital. Many have shared similar experiences and expressed concerns about our policies, particularly regarding the potential harm they may cause to children and families. These opinions come from providers across the clinical spectrum, including trainees, primary care providers, seasoned specialists, as well as nurses, therapists, and support staff. I strongly believe that our organization must acknowledge and address these concerns in a transparent manner. Unfortunately, when I raised these concerns last year, this was not the case. On March 17, 2022, I sent a letter to Dr. Sam Gupta and the UMMC leadership council outlining these concerns. The response I received simply stated, "Your concerns were reviewed by the Committee," without providing further details about the discussion or conclusions. When I requested more information, the email response from Laura Crowley on May 20, 2022, specified that "Because your referral to the Committee for Professional Enhancement (CPE) involves confidential matters that are protected by peer review under Minnesota law, we are not permitted to inform you of the specific outcome."

508. Concerned about continuing threats of retaliation and reassured that CPS had not recommended the immediate removal of Baby C from his parents' care, Sharon withheld submitting the letter of concern at that time.

509. On June 28, 2023, Dr. Sharon was summoned to an in-person meeting with UMP leadership, including Neglia, Nelson, and Ms. Rachel Berg (UMP Human Resources).

510. At the outset of the meeting, Nelson asked Sharon whether he had recently been

84

involved in a "head trauma case." Sharon clarified that she was likely referring to the infant with an incidental intracranial fluid collection—Baby C—whose presentation and clinical course he had previously described.

511. Nelson informed Sharon that the infant's family was considering legal action against the hospital and asked him to explain his involvement in the case.

512. Sharon described his role in accordance with the facts documented in the medical record and reiterated his longstanding concerns regarding the hospital's and CAP team's handling of incidental intracranial findings in infants. Sharon explained that these concerns were not hypothetical; they had been validated in the earlier case of Baby H, in which a misinterpretation of clinical findings and rigid adherence to undisclosed child-abuse policies had resulted in a false accusation of abuse and an unnecessary family separation.

513. At the meeting, Nelson stated that, as a UMP leader and legal counsel, she was concerned about Sharon documenting such opinions and accused him of "weaponizing" his notes and creating liability for UMP.

514. Nelson reiterated the instructions given to Sharon previously that he must avoid documenting such opinions in the future.

515. Consistent with his ethical obligations and prior attempts to raise these issues through internal channels, Sharon handed to Nelson and Neglia the letter of complaints he had recently authored.

516. After receiving Sharon's letter, UMP/U of M/Fairview's leadership council determined that its previous intimidation campaign and manufactured probation would not silence Sharon.

517. UMP/U of M/Fairview's leadership council became concerned that Sharon's

repeated complaints could threaten the institutions' ability to maximize child abuse prosecutions and convictions, thereby jeopardizing significant monetary funding as well as the viability of its prestigious child abuse teaching and fellowship program.

518.    As a result, UMP/U of M/Fairview's leadership council instructed Neglia to constructively terminate Sharon by stripping him of most of his clinical and management responsibilities at Fairview, UMP and the U of M.

519.    On July 7, 2023, Neglia summoned Sharon for a meeting which included Marmet.

520.    At the meeting, Neglia said, "It is time to part ways between the University and you." Neglia explained that there was "too much risk in your documentation," adding that UMP/U of M/Fairview's leadership remained concerned, based on their discussion the previous week and the letter of complaints written by Sharon, that Sharon would "do it again."

521.    Sharon asked Neglia what "it" referred to, and Neglia clarified that he was referring to Sharon's documentation in future cases involving suspected child abuse, specifically the paragraph in Baby C's medical note in which Sharon cautioned against the level of certainty with which a diagnosis of SBS/AHT is made in cases of isolated or incidental intracranial fluid collections.

522.    Among other things, Neglia effectively terminated Sharon's privileges at Fairview's UMP Masonic Children's Hospital, which had the net effect of leaving Sharon without a practice and a platform for teaching medicine.

523.    Neglia told Sharon that he and "senior leadership" had concluded that it was inappropriate for Sharon to document diagnoses in patient charts that conflict with child abuse diagnoses made by the child abuse team, and that was the basis for his termination. There was no other stated basis for Sharon's termination.

524.  Neglia relayed to Sharon that he was being terminated for violating the previously disclosed policy that required him to manipulate medical evidence in favor of Fairview's child abuse pediatricians.

525.  Neglia admitted to Sharon during the meeting on July 7, 2023 that his termination from UMP was directed by Harper and Nelson, even though Harper and Nelson were not Sharon's supervisors or otherwise were not in Sharon's chain of command.

526.  Sharon was told that if he agreed to resign his professorship at the U of M, UMP would continue to pay his salary until the end of the year. Since his termination from the U of M professorship involved tenure rights, Sharon would have to agree to resign his professorship or he would not continue to receive severance pay from UMP.

527.  Neglia also made Sharon promise to keep the circumstances surrounding his termination – including Sharon's complaints about the Harper-based policies – secret and confidential.

528.  In light of the fact that Sharon's employment with UMP had been terminated, he had little choice but to agree to resign his U of M professorship since he would not have had the ability to teach medicine at the U of M after being terminated from UMP and Fairview.

529.  On July 17, 2023, Neglia wrote Sharon a letter on UMP letterhead in which he informed Sharon that his effective termination from UMP was not the result of clinical issues but rather his handling of child abuse cases, e.g. the Baby H and Baby C cases and for speaking out against Fairview, UMP and U of M's child abuse policies.

530.  After his wrongful termination from UMP and U of M – and the professional disgrace that followed from the termination – Sharon was effectively blackballed from practicing in the Twin Cities.

531. Sharon has since been forced to seek temporary employment doing *locum tenens* work around the country in order to make ends meet and provide a living for himself and his family.

532. In early 2025, Sharon was approached by Jessica Lussenhop, a writer for ProPublica, who was doing a story on the University's child abuse system.

533. Sharon decided that he could no longer keep his silence about Defendants' wrongful policies and conduct, which he considered highly damaging to University and Fairview patients and their families and the community at large.

534. Sharon told Lussenhop about his experiences with the University's child abuse program, including the wrongful policies and procedures. Sharon also gave Lussenhop a copy of the Zoom meeting he recorded in which those wrongful policies were discussed.

535. Around that time, Sharon heard about the lawsuit William Reynolds filed against Harper, UMP, U of M and the other defendants, styled *Reynolds v. Harper, et. al,* Case No. 25-CV-754-LMP-SGE in the U.S. District Court for Minnesota.

536. Wishing to continue speaking out against what he perceived as Defendants' continued abuses of families, babies, the medical and criminal justice system, Sharon provided Reynolds with information about his experiences with Harper and the other defendants, along with a copy of the Zoom meeting video.

537. Sharon also contacted counsel for the Reynolds family and agreed to participate as a witness in those cases.

538. The *Reynolds* complaint was thereafter amended to include Sharon's information.

539. A subsequent federal case styled *Ramirez v. Harper et al,* Case No. 25-cv-2266 LMP-SGE also contained Sharon's information, and Sharon agreed to participate as a witness in

that case as well.

540. Defendants were aware that Sharon was likely to be a witness in both federal cases.

541. By that time, Reynolds's identification of the contents of Sharon's Zoom video, in particular, provided new and explosive evidence that child abuse defendants could use to impeach Harper's credibility as an expert as well as the credibility of child abuse diagnoses made at medical facilities under Harper's control.

542. As part of her ProPublica piece, Lussenhop contacted various agents or employees of the University and/or UMP and/or Fairview and asked for comments on Sharon.

543. An agent of the Defendants, or some of them, spoke to Lussenhop and falsely and outrageously told Lussenhop that Sharon was fired due to allegations of inappropriate sexual conduct.

544. The agent of Defendants or some of them gave the fabricated the statement to Lussenhop in order to defame Sharon; destroy his credibility; retaliate against Sharon; intimidate Sharon into declining to be a witness in the federal *Reynolds* and *Ramirez* lawsuits; and change the focus from Defendants' wrongful conduct to a made up story about Sharon's wrongful conduct.

545. The agent of Defendants or some of them who made the defamatory statement about Sharon knew that the statement was false, as did UMP, U of M, Fairview and Harper.

546. Upon information and belief, Lussenhop asked for substantiation of the agent's false statement.

547. After Defendants, or some of them, were unable to provide substantiation for the false statements made to Lussenhop, ProPublica ran the investigative piece without any reference

to the false and defamatory statements about Sharon.

548. Defendants' campaign to retaliate against Sharon for his whistleblowing continued after the ProPublica piece.

549. More recently, Harper was retained as the prosecution's medical expert in a Wisconsin child abuse case, *Wisconsin v. Gebhard,* Case No. 21-CF-2077 in the Circuit Court of Dane County, Wisconsin.

550. Harper's retention as the Dane County expert was facilitated by UMP and upon information and belief, Dane County directly paid UMP for Harper's services.

551. Upon information and belief, during the course of preparing for trial, Harper told the *Gebhard* prosecutor that during trial, she anticipated that defense counsel would use Sharon's Zoom video and his retaliatory termination as a major area of impeachment.

552. Upon information and belief, Harper falsely told the *Gebhard* prosecutor that Sharon was not fired for whistleblowing or issues related to Harper or her policies. Instead, Harper falsely told the prosecutor that Sharon was fired from the University for violating a hospital order that prevented him from being alone with female employees, falsely implying that Sharon had a history of sexual misconduct or harassment.

553. Harper knew and intended that her statements to the prosecutor were false, defamatory and made for the purpose of salvaging her career, expert testimony and the SBS/AHT enterprise.

554. Harper also knew that her expert testimony was monitored and shared among defense counsel and that as a result, Sharon would learn of Harper's false statements to the prosecutor.

555. Harper thus intended that her dissemination of false accusations of sexual

90

misconduct would serve as a warning to Sharon to silence his continued whistleblowing.

556.   As a result of Harper's false, defamatory and retaliatory statements, the Dane County prosecutor asked the court to limit the defense attorney's cross examination of Harper.

557.   Based on false information given to him by Harper, on October 14, 2025, the prosecutor stated, in open court, that Sharon "was fired from the University of Minnesota [for violating] orders barring him from having single alone contact with female staff members."

558.   Harper and/or the other defendants' continuing false statements about the reasons for Sharon's termination have caused Sharon to suffer reputational harm; intimidation; and threats of continuing harm to his reputation unless this Court orders Defendants to cease further defamation, intimidation and retaliation.

### V.   FIRST CLAIM FOR RELIEF: VIOLATION OF PLAINTIFFS' CONSTITUTIONAL RIGHTS TO FREE SPEECH
### Against Defendants Harper, Gupta, Neglia, Fairview and UMP

559.   Plaintiff hereby incorporates each and every averment set forth above.

560.   42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

561.   Plaintiff is a citizen of the United States and was under the jurisdiction thereof at times relevant to this complaint.

562.   Defendants Harper, Gupta, Neglia, Fairview and UMP were at times relevant acting under color of state law for the purposes of 42 U.S.C.§ 1983 and/or conspired with state actors, including Hennepin County, the HCAO and local or county law enforcement, by engaging in the acts and omissions set forth above.

563. Plaintiff has First Amendment rights to free speech and the right to be free of retaliation for exercising his free speech rights, particularly involving academic matters and matters of public concern in a healthcare setting.

564. Plaintiff also has First Amendment rights to academic freedom and the right to be free of retaliation for expressing academic and medical-academic ideas, speech and thoughts, particularly issues of patient safety and public concern.

565. Defendants, acting under color of state law for the purposes of 42 U.S.C.§ 1983, engaged in a pattern and practice of limiting and curtailing Plaintiff's free speech and retaliated against Plaintiff for exercising his rights of free speech and academic freedom involving matters of public concern and public health.

566. Defendants knowingly and intentionally violated Plaintiff's rights to free speech and academic freedom in violation of the United States Constitution.

567. Defendants are not and were not entitled to qualified immunity at the times they violated Plaintiff's constitutional rights.

568. Defendants' unconstitutional conduct was clearly established at the time of Defendants' conduct.

569. Defendants acted with deliberate indifference as to Plaintiff's rights.

570. Defendants' conduct was shocking to the conscience.

571. Plaintiff's free speech was the substantial or motivating factor in Defendants' decision to terminate him.

572. As a proximate result of this unlawful and unconstitutional conduct, Plaintiff has suffered injuries and losses, entitling him to recover compensatory and special damages, including for loss of constitutional rights, loss of enjoyment of life, upset, emotional distress, and

other special damages all in amounts to be proven at trial.

573.   Plaintiff further claims attorneys' fees and costs pursuant to 42 U.S.C. §1988, as well as pre-judgment interest and costs as allowable by federal law.

574.   Plaintiff seeks injunctive relief under 42 U.S.C. § 1983, including an order enjoining Defendants from continuing to engage in the conduct described herein; an order restoring Plaintiff to his former position; and an order restraining Defendants from continuing to retaliate against Plaintiff for exercising his constitutional rights.

575.   In addition to compensatory, economic, consequential and special damages, Plaintiff is entitled to punitive damages in that Defendants' actions were undertaken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

### VI.    SECOND CLAIM FOR RELIEF:VIOLATION OF PROCEDURAL AND SUBSTANTIVE DUE PROCESS RIGHTS IN VIOLATION OF THE FOURTEENTH AMENDMENT

### Against Defendants Harper, Gupta, Neglia, Fairview and UMP

576.   Plaintiff hereby incorporates each and every averment set forth above.

577.   Defendants Harper, Gupta, Neglia, Fairview and UMP were at times relevant acting under color of state law for the purposes of 42 U.S.C.§ 1983 and/or conspired with state actors, including Hennepin County, the HCAO and local or county law enforcement, by engaging in the acts and omissions set forth above.

578.   Plaintiff had procedural and substantive due process rights guaranteed to him by the Fourteenth Amendment to the United States Constitution.

579.   These substantive and procedural due process rights are and were created by Plaintiff's status as an Assistant Professor of Medicine at the University.

580.   Among other things, prior to termination, Plaintiff had the right to notice of the

93

grounds for discipline; a right to respond to notice of grounds for discipline; the right to a hearing, the right to counsel, and the right to appeal any adverse decision.

581.    Defendants failed to provide Plaintiff with any procedural or substantive due process prior to termination.

582.    Defendants' termination of Plaintiff was arbitrary, capricious and retaliatory, thus depriving him of due process rights guaranteed by the United States Constitution.

583.    As a proximate result of this unlawful and unconstitutional conduct, Plaintiff has suffered injuries and losses, entitling him to recover compensatory and special damages, including for loss of constitutional rights, loss of enjoyment of life, upset, emotional distress, and other special damages all in amounts to be proven at trial.

584.    Plaintiff further claims attorneys' fees and costs pursuant to 42 U.S.C. §1988, as well as pre-judgment interest and costs as allowable by federal law.

585.    Plaintiff seeks injunctive relief under 42 U.S.C. § 1983, including an order enjoining Defendants from continuing to engage in the conduct described herein; an order restoring Plaintiff to his former position; and an order restraining Defendants from continuing to retaliate against Plaintiff for exercising his constitutional rights.

## VII.    THIRD CLAIM FOR RELIEF: VIOLATION OF THE RACKETEER INFLUENCED and CORRUPT ORGANIZATIONS ACT, "RICO," 18 U.S.C. § 1961 et seq. Against Defendant Harper, Fairview and UMP

586.    Plaintiff hereby incorporates each and every averment set forth above.

587.    For the purposes of this Complaint, SBS/AHT was and is a RICO enterprise as that term is defined under 18 U.S.C. § 1961(4).

588.    The SBS/AHT enterprise is comprised of a group of individuals and business entities associated in fact as described in greater detail above.

94

589. At times relevant to this Complaint, Defendants Harper, Fairview and UMP received income from a pattern of racketeering activity in which they participated in, in violation of 18 U.S.C. § 1962(a).

590. At times relevant to this Complaint, Defendants maintained an interest in and control over the SBS/AHT enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(b).

591. At times relevant to this Complaint, Defendants were associated with the SBS/AHT enterprise and conducted the enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

592. Defendants' conduct, and the SBS/AHT enterprise itself, affects interstate commerce.

593. The pattern of racketeering activity alleged herein includes, but is not limited to:

a. Multiple acts of wire fraud as defined under 18 U.S.C. § 1343 and 18 U.S.C. § 1961(1), including multiple uses of interstate wires for the purpose of perpetuating the fraudulent schemes in which Defendants bilked governmental entities and taxpayers out of money and property;

b. Multiple acts of extortion or coercion as defined under 18 U.S.C. § 1961(1), including acts of extortion directed toward Plaintiff, coworkers and caseworkers; and

c. Multiple acts of evidence and witness tampering in violation of 18 U.S.C. § 1512.

594. Defendants' pattern of racketeering activity has been continuous for at least the past 10 years and continues up to the present time.

595.     Defendants' pattern of racketeering has caused Plaintiff to suffer injuries to his business and property in amounts to be determined by the jury at trial.

596.     Plaintiff further claims treble damages and attorneys fees as provided by 18 U.S.C. § 1964(c).

597.     In addition, Plaintiff seeks all equitable remedies available under 18 U.S.C. § 1964(a), including appropriate Court orders imposing reasonable restrictions on the SBS/AHT enterprise; Ordering Defendants' divestiture from the enterprise, including Harper's position within Hennepin County's child abuse prosecution structure; An order prohibiting Harper from continued involvement in child abuse prosecution; An order restoring Plaintiff to his former positions; and any similar orders as justice requires.

## VIII.   FOURTH CLAIM FOR RELIEF: CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED and CORRUPT ORGANIZATIONS ACT, "RICO," 18 U.S.C. § 1962(d) Against Defendants Gupta, Neglia, Marmet, Fairview and UMP

598.      Plaintiff hereby incorporates each and every averment set forth herein as if each and every averment were set forth verbatim herein.

599.     As set forth above, Defendant Harper, UMP and Fairview engaged in a pattern of racketeering activity in violation of RICO, 18 U.S.C. § 1961 *et seq.*

600.     The above-named defendants, and each of them, conspired and agreed with Harper and others to adopt the goal of furthering the SBS/AHT enterprise by engaging in conduct that furthered the enterprise.

601.     As described above, each of the Defendants have conspired with Harper and others to aid, assist, abet and further a pattern of racketeering activity.

602.     Defendants conspired with Harper and others to engage in RICO violations by

engaging in the acts and omissions described above and by providing Harper with the power, office and title to silence and retaliate against Plaintiff; by empowering Harper to cause the fabrication and alteration of medical evidence used in child abuse civil and criminal prosecutions; and by implementing and enforcing the unlawful policies, procedures, practices and customs created by Harper; and by assisting Harper in retaliating against Plaintiff and terminating him from his positions so that the enterprise could continue operating unabated by Plaintiff's interference.

603.    Defendants' conspiracy to violate RICO has caused Plaintiff to suffer injuries to his business and property in amounts to be determined by the jury at trial.

604.    Plaintiff further claims treble damages and attorneys fees as provided by 18 U.S.C. § 1964(c).

605.    In addition, Plaintiff seeks all equitable remedies available under 18 U.S.C. § 1964(a), including appropriate Court orders imposing reasonable restrictions on the SBS/AHT enterprise; Ordering Defendants' divestiture from the enterprise, including Harper's position within Hennepin County's child abuse prosecution structure; An order prohibiting Harper from continued involvement in child abuse prosecution; An order restoring Plaintiff to his former positions; and any similar orders as justice requires.

### IX.    FIFTH CLAIM FOR RELIEF: COMPUTER FRAUD AND ABUSE ACT
### 18 U.S.C. § 1030
### Against Defendants Harper, George, Fairview and UMP

606.    Plaintiff hereby incorporates each and every averment set forth above.

607.    Harper, George, and agents of Fairview and UMP knowingly and with intent to defraud, accessed a protected computer in excess of authorized access, and by means of such conduct furthered the intended fraud described above and obtained things of value;

608.    Harper, George, and agents of Fairview and UMP intentionally accessed a protected computer without authorization or in excess of authorization and as a result of such conduct caused damage and loss.

609.    The damage and loss caused by Defendants' conduct exceeds $5000.

610.    Defendants' conduct caused the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis treatment or care of one or more individuals; physical injury to persons; and a threat to public health or safety.

611.    Defendants' conduct is continuing unabated as a result of the policies, procedures, practices and customs identified above.

612.    Pursuant to 18 U.S.C. § 1030(g), Plaintiff claims compensatory damages in amounts to be determined by the jury at trial; as well as injunctive relief.

## X.    SIXTH CLAIM FOR RELIEF: MINNESOTA WHISTLEBLOWER STATUTE, MINN. STAT. § 181.932
### Against Defendants Harper, Gupta, Fairview and UMP

613.     Plaintiff hereby incorporates each and every averment set forth above.

614.    Defendants unlawfully discharged, penalized, disciplined, interfered with, threatened, restrained, coerced and retaliated against Plaintiff in response to his good faith reports of violations or suspected violations of state, federal and common laws or rules.

615.    Defendants unlawfully discharged, penalized, disciplined, interfered with, threatened, restrained, coerced and retaliated against Plaintiff for making a good faith report regarding the quality of Defendants' health care services; the fact that Defendants' health care services violated state or federal laws or regulations; the fact that Defendants' provision of health care services violated national clinical and ethical standards; and the fact that Defendants' provision of health care services actually and potentially placed the public at risk for harm.

98

616.    Defendants unlawfully discharged, penalized, disciplined, interfered with, threatened, restrained, coerced and retaliated against Plaintiff for communicating the findings of scientific studies that conflicted with Defendants' fraudulent scheme.

617.    Defendants unlawfully discharged, penalized, disciplined, interfered with, threatened, restrained, coerced and retaliated against Plaintiff for his good faith, truthful communication of information of Defendants' fraud or misuse of state programs or services to his employer, a governmental body and/or a law enforcement official.

618.    Plaintiff claims all remedies available under Minn. Stat. § 181.934, including compensatory damages, costs, disbursements and attorneys fees.

619.    Plaintiff also seeks injunctive relief including the restoration of his positions at U of M and UMP.

### XI.    SEVENTH CLAIM FOR RELIEF: DEFAMATION
### Against Defendants Harper, U of M and UMP

620.    Plaintiff hereby incorporates each and every averment set forth above.

621.    Harper and/or U of M and/or UMP's agent(s) made objectively, knowingly and intentionally false statements about the reasons for Plaintiff's termination to persons other than Plaintiff.

622.    Harper and/or U of M and/or UMP's agent(s) acted with malicious intent in making the knowingly false statements to persons other than Plaintiff.

623.    The knowingly false statements made by Harper and/or U of M and/or UMP's spokesperson constitute defamation *per se* because the false statements implicated Plaintiff in serious misconduct in his profession.

624.    Plaintiff suffered reputational harm and compensible damages as a result of Defendants' defamation.

625.    Plaintiff also claims all damages available under Minnesota law.

## XII.    EIGHTH CLAIM FOR RELIEF: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### Against Defendants Harper, Gupta, Fairview and UMP

626.    Plaintiff hereby incorporates all previous averments.

627.    Defendants Harper, Gupta and Crowley's conduct, as described in detail above, was extreme and outrageous.

628.    Defendants UMP and Fairview directed, adopted and ratified the extreme and outrageous conduct of their agents, Harper, Gupta and Crowley.

629.    Defendants, and each of them, intended to cause Plaintiff severe emotional distress or otherwise acted recklessly in causing Plaintiff to suffer extreme emotional distress.

630.    Plaintiff suffered severe emotional distress caused by Defendants' extreme and outrageous conduct in amounts to be determined by the jury at trial.

## XIII.   NINTH CLAIM FOR RELIEF: PRIVATE ATTORNEY GENERAL/DECEPTIVE TRADE PRACTICES IN VIOLATION OF MINN. STAT. § 8.31, SUBD. 3
### Against Defendants UMP, U of M and Fairview

631.    Plaintiff hereby incorporates each and every averment above.

632.    At times relevant, Defendants Farview, U of M and UMP advertised themselves as providing the highest quality of care and services to Minnesota's pediatric population.

633.    These defendants promised, in widespread advertising and marketing, among other things:

a.    We provide the most comprehensive and integrated pediatric care in the region;

b.    here, the world's foremost experts just happen to come with the most caring hearts;

c.     the pediatric specialists who are at the forefront of medicine *all* think and work as a team to surround every child with the coordinated care they need – and every parent with the partnership they need.

d.     It is our mission to bring hope and healing to the families we serve by caring for one child at a time, while advancing research, education, and healthcare on behalf of all children.

e.     We believe working together as a team – with you and your child at the center of everything we do – leads to better outcomes, healthier kids, and happier parents.

634.    Defendants knew and intended that these promises were false as to a wide swath of pediatric patients, particularly those admitted to Fairview with brain bleeds, broken bones or other types of injuries that automatically sweep the patient into the care of Fairview's CAPs.

635.    Defendants know and intend that pediatric patients automatically transferred to the CAPs do not receive team care, clinical care or the types of care the patient's family expected or intended by bringing their baby to Fairview or a U of M affiliated hospital that has implemented the CAPs policies described above.

636.    Defendants' conduct constitutes restraint of trade, consumer fraud, deceptive trade practices, and the sort of egregious, fraudulent conduct Minnesota's consumer protection legislation, including Minn. Stat. § 325D is designed to remedy.

637.    Because the conduct alleged herein chills the rights of families of babies in the Twin Cities Metropolitan Area to seek emergency and routine medical care for brain bleeds, traumatic brain injuries, broken bones, connective tissue injuries, bleeding disorders and failure to thrive, among other things, without fear of false prosecution and forced family separation; and

101

because the Attorney General is aware of but has failed or refused to act to prevent the institutional defendants' continuing restraint of trade, Plaintiff brings this claim as a private attorney general under Minn. Stat. § 8.31, subd. 3 to enjoin further consumer fraud.

638.   Defendants also disparaged Plaintiff's business and professional services by making the false statements identified above, in violation of Minn. Stat. § 325E.44, Subd. 1(8).

639.   Plaintiff further claims actual damages and attorneys fees as provided by Minn. Stat. § 8.31, subd. 3 and other statutes.

### XIV.   TENTH CLAIM FOR RELIEF: TORTIOUS INTERFERENCE WITH CONTRACT
### Against Defendants Harper and George

640.   Plaintiff hereby incorporates all allegations above.

641.   Plaintiff had a contract with UMP and the U of M.

642.   Harper and George knew that Plaintiff had a contract with UMP and the U of M.

643.   Harper and George intentionally and unjustifiably induced a breach of Plaintiff's contract with UMP and the U of M.

644.   Plaintiff suffered damages from the breach of contract caused by Harper and George.

### XV.   ELEVENTH CLAIM FOR RELIEF: CIVIL CONSPIRACY
### Against ALL Defendants

645.   Plaintiff hereby incorporates all allegations above.

646.   As set forth in detail above, Defendants agreed with one another to commit a series of unlawful acts in furtherance of a lawful goal and/or agreed to further an unlawful goal by and through a series of lawful acts.

647.   In particular Gupta, Neglia, Marmet, Hennepin County, U of M, UMP, and others, including Hennepin County, agreed with one another and with Defendant Harper to obtain

increased funding, resources and grants from Bremer and government agencies by and through finding and increasing the number of child abuse prosecutions and convictions regardless of the medical bases underlying those prosecutions.

648.    These defendants agreed with one another that the goal of obtaining increased funding, resources and grants from Bremer and government agencies through finding and increasing the number of child abuse prosecutions and convictions could only be accomplished through illegal and fraudulent means, including through the indictment and/or prosecution of innocent persons and by bringing baseless juvenile court actions in support of the criminal prosecutions.

649.    These defendants agreed with one another that the best method for accomplishing the goal of increased funding and resources through the indictment and prosecution of child abuse would be to adopt the policies, procedures, practices and customs developed by Harper and her collaborators at the Helfer Society, and as outlined in detail above.

650.    Defendants knew and intended that the policies, procedures, practices and customs developed by Harper and her collaborators at the Helfer Society, and as outlined in detail above were wrongful, illegal and unethical because they required the participating physicians and child abuse case workers and their attorneys to alter, omit, manipulate and fabricate medical evidence; and that the practices implemented by Harper would necessarily result in false prosecutions and convictions.

651.    Despite their knowledge and intent that their conduct and agreement was unlawful and injurious to innocent parents and caregivers, Defendants agreed to engage in the conduct described herein in order to benefit Defendants financially, politically, academically, reputationally and personally. Defendants also conspired with one another and with others to

engage in the wrongful acts, wrongful conduct and retaliation against Plaintiff in order to prevent him from disrupting Defendants' illegal child protection enterprise and scheme.

652.    Defendants carried out this goal to silence Plaintiff and retaliate against him by and through the acts and omissions identified above.

653.    Defendants' unlawful  civil conspiracy has caused Plaintiff to suffer damages, injuries and losses in amounts to be determined by the jury.  Plaintiff further claims punitive damages stemming from Defendants' intentional and willful civil conspiracy.

### XVI.    TWELFTH CLAIM FOR RELIEF: REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF
### Against Defendants Harper, UMP, U of M, and Fairview

654.    Plaintiff hereby incorporates each and every averment set forth above.

655.    28 U.S.C. § 2201 and Fed. R. Civ. P. 57 empower the Court to declare the rights and obligations of the parties, including the Defendants.

656.    Plaintiff requests an order declaring that:

    a.    Defendants' policies, procedures and protocols outlined above are unlawful and unconstitutional;

    b.    The intertwined organizational structure implemented by Hennepin County, which makes Defendants a part of the criminal and civil prosecution team and which makes Harper the *de facto* decision maker in criminal and civil prosecutions is unlawful and unconstitutional; and

    c.    The institutional defendants' conduct constitutes an unlawful restraint of trade;

657.    Plaintiffs further request injunctive relief pursuant to Fed. R. Civ. P. 65 in the form of an injunction prohibiting the conduct and organizational structure identified above;

104

prohibiting the implementation of the wrongful policies, procedures, customs and practices outlined above; and effectively unwinding the current child abuse protection and prosecution structure currently in place in Hennepin County.

## XVII.  CONCLUSION

658.    For the reasons set forth herein, Plaintiffs pray that this honorable Court grant judgment in his favor and following trial to a jury, award the following damages in excess of $20 million and other remedies available by law, including:

a.    Pecuniary loss, including all available economic, compensatory and noneconomic loss as set forth herein;

b.    Punitive damages;

c.    Attorney's fees;

d.    Pre and post judgement interest;

e.    Treble damages;

f.    Injunctive relief;

g.    RICO remedies; and

**h.**    Declaratory relief;

**PLAINTIFF REQUESTS TRIAL TO A JURY.**

DATED December 12, 2025

LAW OFFICES OF J.M. REINAN

/s/ Jerome M. Reinan

_____

#24322X
Attorney for Plaintiffs
1437 High Street
Denver, CO 80218
jreinan@reinanlaw.com
303.894.0383

105